## Louisville & Nashville Railroad Company v. Steele, By et al.

(Decided March 5, 1918.)

Appeal from Knox Circuit Court.

1. Railroads—Duty and Care to be Exercised by at Places Where Children are Habitually Permitted to Get on Moving Trains.—At places where children are habitually permitted by the conductor

to jump on and ride on his train, the railroad company through
its servants is under a duty to anticipate the presence of children
about the train and to exercise ordinary care to discover their
presence and to prevent injury to them.

2.  Railroads—Duty to Trespassing Children.—A railroad company in
the operation of its trains is under no duty to anticipate that chil-
dren will attempt to get on its trains, unless by its course of con-
duct in permitting them to do so it puts on itself this duty.

3.  Railroads—Trespassing Children May be Arrested.—Section 805
of the Kentucky Statutes makes it an offense for any person
except passengers and employes to get on a moving train.

4.  Railroads—Duty to Children Trespassing on Railroad Train.—The
only duty the train crew owe to a child, who is trespassing on
a train moving or about to move, is to exercise ordinary care
to prevent injury to him after his peril is actually discovered.

5.  Railroads—Liability to Injured Child on Account of Acts and
Conduct of Conductor.—Where the conductor of a train permitted
children, in violation of the rules of the company, to board it,
the company was liable to a child who was injured while attempt-
ing to get off.

6.  Railroads—Children—Evidence as to Habits in Boarding Train.—
In a suit to recover damages for injuries to a boy received when
he fell from a moving train, it was competent to show that boys
at the place where he was injured habitually got on the train
in the presence of and with the consent of the conductor.

7.  Railroads—Children—Evidence That Conductor Was Warned Not
to Let Boy on Train.—In a suit to recover damages for injuries
sustained by a boy when he fell from a moving train, it was
competent to show that the father of the boy had warned the
conductor to keep his boy off the train.

8   Railroads—Children—Contributory Negligence.—Contributory neg-
ligence will not as a matter of law bar a recovery by a bright,
intelligent boy eight years old who lived near a railroad and had
been warned not to go about trains, who was injured when he
fell from a train on which he was riding.

9.  Railroads—Contributory Negligence—Capacity to Understand.—In
cases where contributory negligence is in issue, ability to under-
stand implies age, capacity and experience sufficient to appreciate
and comprehend the full meaning and effect of what one does, and
it is this degree of capacity that the law presumes men and boys
of mature years to possess. But when it comes to children of
immature years, the question is for the jury.

BENJAMIN D. WARFIELD and BLACK & OWENS for appellant.

J. M. ROBSION for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Noble Steele, a boy eight years old, while attempting
to let go of or alight from the steps of a moving coal car

on which he was riding, or which he had hold of while running by the side of the car, was thrown under the wheels and both of his feet cut off. In this suit by his next friend to recover damages for the injuries so sustained, there was a verdict and judgment in his favor for ten thousand dollars, and on this appeal a reversal is asked on several grounds to which attention will be called.

At the time the injuries complained of occurred, and for two or three years before, the railroad company operated daily between Corbin and Page, Ky., a coal train, in charge of Conductor Wilder, which took empty coal cars each day from Corbin to coal mines in the vicinity of Page, and brought back from the mines to Corbin cars loaded with coal. In making these trips the train usually stopped or ran at a slow rate of speed through a village called Grays, having a population of probably five hundred, consisting mostly of miners; and it was here that Noble Steele lived with his parents. It appears that there were at and about Grays quite a large number of boys between six and fifteen years of age who were apparently permitted by their parents to run at large, and these boys, or a great many of them, were in the habit of getting on, riding on, and jumping off this train, in charge of Conductor Wilder, every day as it went through Grays, and this practice had continued for two years or more before Noble was injured.

On the trial there was evidence for the plaintiff by five or six persons who lived at and near Grays that it was a very common thing to see from ten to twenty boys between six and fifteen years old riding at the same time on this coal train in charge of Wilder. Some of the boys, according to the witnesses, would ride on the engine, at other times in the caboose, and again by getting on the steps or stirrups of the coal cars, or on the trucks. These witnesses further said that many times these boys were not only permitted by Wilder and other members of the crew to jump on the train and ride, but were enticed and encouraged by them to do so, and daily got on the train in the presence of Wilder without any objection on his part and that this practice on the part of the boys and Wilder had habitually continued for two years or more.

There was further evidence by Noble to the effect that on the occasion of his injury he got on a step of a

coal car five cars from the caboose, before the train started, and after he had climbed on the step he saw Conductor Wilder come out on the step of the caboose and signal the engineer to start the train. He said that at the time, and before the conductor gave the signal to start, each was in plain view of the other, and he was looking at Wilder and Wilder was looking at him; that after the train started and was beginning to run rather fast, he attempted to get off and his feet got under the wheels; that before this he had ridden many times on Wilder's train; that sometimes Wilder would see him and sometimes he would not, but that he had never said anything to him about not getting on the train; that sometimes Wilder would ask him to ride and at other times he would get on without being asked.

He also testified that he knew it was dangerous to go about or get on moving trains, as he was liable to get under the wheels and be killed or crippled; that he had often been warned by his father and other men about Grays not to do so and had been whipped by his father for jumping on trains, but that he had been doing this for about two years before he was hurt.

The father of Noble testified that he had warned him not to go about trains and had whipped him for doing so, and shortly before the accident to Noble had talked to Conductor Wilder about him and told him to keep Noble away from the train, but that Wilder said to let him have his fun; that it would make a good railroad man out of him some day.

For the railroad company Conductor Wilder testified that he had never played or joked with Noble or any of the boys, or invited, encouraged or permitted any of them to ride on his train, nor had Noble or any of the boys ever gotten on the train in his presence without objection and protest on his part; that he had done everything that was possible for him to do to keep the boys off the train; that he did not see Noble hanging on the step of the coal car when he gave the signal to start the train, nor did he know that he was on or about the train; that he had no authority from the company to permit any person to get on the train or ride without a pass, and that he had never done so, as it was against the rules of the company to allow it. The other members of the crew, while admitting that a number of boys about Grays were in the habit of daily jumping on and off the coal train,

denied that they had ever permitted or encouraged them to ride, or that they had ridden in their presence without objection. They said that whenever they saw the boys on, or trying to get on, the train they made them get off or go away but that sometimes, on account of the length of the train and the difficulty in getting over it quickly, it was not possible to keep the boys off the train.

All of the evidence on behalf of the plaintiff as to the habitual custom, extending over a period of two or three years, of numbers of small boys jumping on, riding on, and getting off this coal train in charge of Conductor Wilder, and as to the habitual practice of Wilder, the conductor, and the other members of the train crew for this length of time, in permitting small boys to get on and ride on the train, and tacitly if not actively inviting, encouraging and permitting them to do so, was objected to by counsel for the railroad company, and clearly it was very prejudicial to the rights of the railroad company if incompetent. Whether this evidence was admissible or not depends on the question whether the railroad company was under any duty, under the facts and circumstances disclosed in the evidence for the plaintiff, to anticipate the presence of boys on and about this coal train in charge of Wilder as it went through Grays, and to exercise ordinary care to prevent injury to them. If it was under such duty, then the evidence was competent for the purpose of bringing home to the company notice of the custom of the boys and the necessity that accordingly existed to look out for their presence on and about the cars, and to exercise ordinary care to avoid injury to them.

But if it was under no duty to anticipate their presence, then it was under no duty to take care not to injure them until after they had been put in peril and this peril was actually discovered.

In determining whether the company was under a duty to anticipate the presence of these boys on and about the cars and consequently under a duty to take care not to injure them, the evidence conducing to show that the boys followed this practice in the presence of and at least by the tacit permission of Conductor Wilder, and without objection on his part, should not be lost sight of.

It is a material and controlling factor in the case to be considered in connection with the well known attrac-

tiveness of engines, cars and railroad trains for boys
and the great danger attending their efforts to go upon
or about them when running or when liable to be moved;
and when so considered we think there can be no doubt
that the company was under a duty to anticipate the pres-
ence of boys on and about the cars at Grays, and to
exercise ordinary care not to harm them; and this under
the principle frequently announced by this and other
courts, that owners of dangerous premises, machinery,
or appliances that are attractive and accessible to chil-
dren, who habitually permit children to play about them,
are required to take notice of their habits and to exer-
cise care to prevent injury to them.

It follows from this that there should be applied to
railroad companies the same degree of care in respect
to looking out for children who habitually go about and
upon their trains in the presence of and with the con-
sent of the servants in charge, or at least without objec-
tion on their part, that is required to be exercised by
other persons in charge of dangerous places, machinery,
or appliances that are attractive to children.

What this degree of care is has been announced by
this court in an unbroken line of decisions setting forth
that the owner of easily accessible, attractive and dan-
gerous places, appliances or machinery, who knowingly
permits children of tender years to play about them,
must anticipate their presence where he has allowed
them to go and be, and must exercise ordinary care to
protect them from the danger to which they will be sub-
jected: Brown v. C. & O. Ry. Co., 135 Ky. 798; Wells v.
Kentucky Distilleries & Warehouse Co., 144 Ky. 438;
Bransom's Admr. v. Labrot, 81 Ky. 638; Lyttle, Admr.
v. Harlan Town Coal Co., 167 Ky. 345; Miller v. Chand-
ler, 168 Ky. 606; Merschel v. L. & N. R. R. Co., 27 Ky. L.
Rep. 465; City of Owensboro v. York's Admr., 117 Ky.
294.

These cases go farther, in respect to the duty that
owners of accessible, attractive and dangerous places
and premises owe to children that they permit to go about
them, than the duty and care railroad companies must
exercise as we have stated it. But in view of the fact
that railroad trains and cars are necessarily in exposed
and easily accessible places, we think the duty the com-
pany owes to children should be limited to cases in

which children are knowingly permitted by the persons in charge to get on and go about them.

Another pertinent case on the care that must be exercised to protect children who play about railroad premises and trains is Kentucky Central R. R. Co. v. Gastineau's Admr., 83 Ky. 119. In that case Robert M. Gastineau, a boy between fourteen and fifteen years of age, was run over and killed by a car of the railroad company which he was endeavoring to uncouple from the train while it was switching in the company's yard. The jury found by a special verdict that the deceased when killed was voluntarily assisting the employes of the road, with their knowledge and consent, in switching the cars; that they discovered his peril but too late to prevent his death, and that he contributed to it by his presence and efforts to uncouple the car. It is further set out in the opinion that the record did not show what employes of the road, who were present when the accident occurred, knew of and consented to the decedent's assisting in the switching of the train, although it did appear that none of them had any express authority from the company to authorize it. And the court, after setting forth the duty and care railroad companies owe to adult trespassers said:

"The question recurs, did his age alter this rule? Undoubtedly children of tender years should not be treated strictly as trespassers when, guided by childish instincts, they stray upon the track or into the yard of a railroad. Thus the rule that a traveler, about to cross a railroad track, must be vigilant and look both ways, does not apply to an infant of tender years. He knows nothing of care, diligence or danger. The rule as to negligence upon his part, and by an adult, is, properly, quite different. The latter must give that care to his own protection which is ordinarily exercised by one of ordinary discretion; while less is required of an infant, the degree depending upon his age, maturity and knowledge. We are aware that it has been held in some cases, as, for instance, in Flower v. Railroad Co., 69 Pa. 210, that if the deceased is a trespasser, his being of tender years makes no difference, because the company is under no duty to him which requires his protection; but, in our opinion, age should be considered upon a question of contributory negligence; and one should exercise reasonable care to anticipate and prevent an injury to a

child of such tender years as to have little or no discretion, although he may be technically a trespasser. His condition excuses concurrent negligence. Humane considerations require such a rule.

"Thus one may incur liability for an injury to a child of tender years by leaving dangerous machinery where it is accessible to him, although there would be no liability to an adult or a child of years of discretion under like circumstances. So a railroad company should be held liable if its employes, in charge of its moving train, see that a child, say two years old, is walking around it, and fail to look to its protection, although it may technically be a trespasser, and not, at the moment, in immediate danger. Their neglect to do so would be wilful. A child without discretion, although a trespasser, occupies a legal attitude to the company similar to that of an adult, who is not a trespasser, save a greater degree of caution should be exercised as to the former, by reason of his helplessness."

Another is Louisville & Nashville R. R. Co. v. Popp, 96 Ky. 99, where the facts were these: An infant between five and six years old was injured when a passenger car standing on a siding at a station was put in motion. It appears from the opinion that the injured boy, accompanied by three other boys, one of whom was nine years old, stopped on the platform at the depot, from which place they were driven off by the baggagemaster. A passenger and another employe of the company also tried to make them go away by threats of one sort and another, but instead of leaving the premises they went to the west end of the platform and into the standing car for the purpose of getting ice water. After getting the water they loitered about the car until an engine with four cars attached backed on the track in order to make a coupling. When the injured boy saw the cars to be coupled coming, he became freightened and called to some person to help him to the platform, and in an effort to escape endeavored to get on a bumper placed at the end of the siding to keep the cars from running off the track. There was no direct evidence that those in charge of the backing train, or any other employe, actually saw the injured boy on the platform in time to avoid injuring him. And the court said:

"There is another aspect in which the conduct of appellant's employes shows negligence of a reprehensible

character. It was known to them that children of all ages were in the habit of resorting to the depot premises, yet not only were the two cars coupled to the backing train without any servant being in a position to warn appellee of his danger, but one of the cars, if not both, was left open, so as to invite and tempt children to en-. ter, as appellee and his companions did do; and if the two men who gave them water were not actually employes, the fact is thus made apparent that the cars were left so open and exposed that any one, child or adult, might enter at will, no employe being present to prevent or warn them of the coupling process that would and did shortly take place.

"In our opinion, if appellant elected to keep uninclosed its passenger depot and adjacent premises, so that children might go there, and tempted by curiosity or thirst, wander upon its railway tracks and into its cars, it was the duty of its employes to know appellee's position and danger, and to be in a position at the proper time to protect him from injury by its moving trains and cars, especially as it was improper to couple cars on that track and at that place."

Many other courts have laid down the same principles that are well stated by the Georgia Supreme Court in Ashworth v. Southern Ry. Co., 116 Ga. 635, 59 L. R. A. 592, a case more nearly like this one on the facts than any that has come under our notice. In that case it appears from the petition, which the court held stated a cause of action, that for two or three years prior to the day of the injury to Ashworth it was the custom of children living in a little town through which the train ran to board the engine and cars, and this custom of the children, of riding upon and jumping off the cars and engine, was known to the defendant company through the knowledge of its servants and employes who operated the train. The children who were accustomed to board the engine and cars ranged in age from six to fifteen years. Ashworth, who was eight years old, in common with a number of other children, climbed upon and into the cars, and Ashworth got on the running board of the engine, and after it had started they attempted to jump off, at which time Ashworth fell under the wheels and both of his legs were cut off. The court upon these facts said:

"If a railroad company expressly invites or tacitly permits persons to be upon its premises, or in and about its machinery, the company owes to such persons the duty, not only not to injure them when their presence becomes known, but also to anticipate their presence at the time when or the place where such invitation or permission would probably bring about their presence, and to take such measures as ordinary prudence would require to prevent injury to them if they are in fact present. A railroad company is the owner of its right of way, its track, and its machinery, and is entitled to exclude therefrom others who have no interest or right therein. A railroad company which continuously permits persons to be upon its right of way, or in or about its machinery, at given times and places, is put on notice by this conduct on its part that such persons may be present at such times and places; and by this conduct it imposes upon itself the duty, not only to prevent injury to such persons, but to anticipate their presence, and take the precautions of an ordinarily prudent person to prevent injury to them.

"Railroad companies may not be bound to anticipate that children will be allured by passing trains, and attempt to board and ride upon them. But when the right of way of a railroad company extends through a place used by a number of children, of ages varying from six to fifteen years, as a playground, and when these children are accustomed continuously, every time the train enters the playground when they are upon it, to swarm upon the train and ride to the limits of the playground, and when the employes of the company know of this custom and make no objection to it, the company is bound to carry the burden which such a knowledge and tacit permission impose, and this burden would require the company to comply with the demands of ordinary care for the prevention of injury to the children."

It is insisted, however, by counsel for the company that the facts of this case do not bring it within the scope of the rule laid down in the cases referred to, but that it is and should be controlled by the doctrine announced in L. & N. R. R. Co. v. Webb, 99 Ky. 332; Monehan v. South Covington & Cincinnati St. Ry. Co., 117 Ky. 771; Swartwood's Gdn. v. L. & N. R. R. Co., 129 Ky. 247, and other like cases.

In the Webb case, Webb, a boy eleven years old, while attempting to get off of a moving freight train, slipped, and one of his legs getting under the wheels, it was cut off. It appears from the opinion that Webb and other boys about his age had occasionally assisted in unload-'ing freight at the depot of the company previous to the day on which the accident occurred, and that the conductor encouraged the boys to assist in unloading the freight by promising them that they might ride on the train from the station to the water tank. Webb had ridden twice on the train to the tank before he was injured, but on the day he received the injuries he was not at the depot when the train arrived, but the other boys were and assisted in unloading the freight, although Webb did not, nor did the conductor say anything to him about it or promise him a ride or invite or request him to ride. Webb reached the depot while the boys were unloading and just before the train started.

After the train arrived at the tank and had stopped, Webb and the other boys who had ridden to the tank got off and went back towards the rear of the train, and after it started Webb and the other boys took hold of the ladders on the side of the cars and in a little while jumped from them to the ground while the train was moving; when Webb jumped his feet struck a pile of coal near the track and his foot went under the wheels.

There was no evidence that the conductor or any of the other employes of the company saw Webb or the other boys when they took hold of the ladders or when they were swinging from them.

In discussing the case the court said, in part, that the company could not be made liable unless its servants voluntarily and knowingly exposed Webb to the dangers which resulted in his injury, or knowing that he was in danger, negligently failed to use such means as were in their power to relieve him from the danger, further, saying:

"In this view of the case, in order to render the appellant liable, it was necessary to prove that the conductor of the train persuaded or invited the infant appellee to get on the train and ride to the water tank; that the accident that happened there in which he was injured was one that was likely or might reasonably have been expected to happen to him in the ordinary or natural course of events; that the agents or servants of the ap-

pellant negligently failed to exercise care for his protection commensurate with the danger to which they had voluntarily exposed him. . . .

"The bill of exceptions contains no evidence introduced by either party that showed that the conductor either invited or induced the infant appellee to ride to the water tank on the day he was injured, or that the conductor was aware that he intended to board the train, or when he did so. . . . And the evidence fails to show that the conductor, or any of the trainmen, saw the appellee after reaching the tank until after his foot was mashed."

In holding that it was inadmissible to show what the conductor did and said to the boys on days before the accident about letting them ride to the tank if they would help unload the freight, the court said: "This testimony ought to have been rejected. The case was between the infant appellee and the appellant, and the subject of the investigation was what occurred on the day the injuries were inflicted, and what occurred on previous days had no necessary connection with and was in no sense a part of the transactions of that day. For this reason also the court properly refused to allow proof to be made in behalf of the appellee of what it was alleged the conductor and the trainmen said to the boys on occasions before that day about swinging on the ladders attached to the sides of the cars, and telling them to do this in order to learn to be 'hoppers' and the like, and that the boys were in the habit of practicing in that way on previous occasions when they rode to the tank."

It will be observed that the court, in the course of the opinion, said that in order to hold the railroad company liable, it was necessary to show that the conductor of the train permitted or invited Webb to get on the train, and that the accident that happened to him was one that was likely or that might reasonably have been expected, and that the evidence failed to show these requests.

It will further be noticed that at no time did the conductor agree that the boys might ride on the train any farther than the water tank, and that after the train had started from the water tank after stopping there, Webb was hurt in trying to get off and at a time when neither the conductor nor any of the train crew knew he was on the train.

Looking at it in this light, although the company might have been liable if Webb had been hurt between the station and the water tank, on account of the habit of the boys in riding from the station to the water tank, when the train left the tank after stopping there to take water and started on its journey, Webb when hurt was not on the train by the invitation or permission of the conductor, because the permission of the conductor to ride ended when the train reached the water tank; and so when the train started the conductor was under no duty to look after the safety of the boys, as he was not required to anticipate that they would attempt to get on the train after it left the tank. In other words, the decision of this case was put upon the ground that Webb was a trespasser at the time he got hurt, not technically but actually, and hence the company did not owe him any duty except to exercise ordinary care to prevent injury to him after his peril was discovered.

In the Monehan case, Monehan, who was six or seven years old, in company with another boy of the same age, got on the steps of the rear platform of a street car, while it was standing at a street intersection, without invitation or consent then or before, and on the opposite side of the car from where the passengers were taken on and let off. When the car started he was jolted off and received injuries, for which he sued. There was no evidence that the conductor saw the boy on the steps, but it was contended that by the exercise of ordinary care he could have seen him, and whether the company was under a duty to exercise ordinary care to discover his presence was the real question in the case. And the court said, "Monehan was a mere trespasser upon the rear steps of the car, and those in charge of it did not owe him any duty of discovering his peril." Plainly this case has no application here.

In the Swartwood case the question for decision was whether railroad companies whose lines traverse cities and towns or run through populous communities must maintain a lookout for children who are in the habit of jumping on and off the cars while in motion. The petition, to which a demurrer was sustained, charged, in substance, that Swartwood, a boy about eight years old, and other children, were in the habit of jumping on and off the cars while in motion, and that the company was aware of this practice. It was not charged that the com-

pany knew that the boy was attempting to get on the car at the time he did, or that the company had neglected to use any precautions to save him from injury after discovering his peril. And the court said:

"If the operators of the train know of the actual presence of such trespassers, for such they are, they are required by the humaneness of the law to not injure them if with the means at their command they can avoid doing so. Nor will the inconvenience and annoyance entailed be counted. The courts have not gone farther than that. The legislature may, but it has not. Any other rule, particularly the one contended for by appellant, would require practically that such railroads should police all their lines and vehicles in such cities and towns in anticipation of the dangers to thoughtless and heedless persons. . . .

"All who venture unbidden by the company, and unknown to it, upon its trains, do so at their own peril, as they can have no right, and the company therefore owes them no duty in such case. This rule also applies from the very necessity of the matter, without respect to the age or condition of the trespasser, for the court must deal with the question first of legal duty, not compassionable innocence."

It will be observed that in that case there was no evidence, as there is in this, to show that the conductor habitually or at all permitted and encouraged boys to board the cars, and this, it may be remarked, is the only feature of the case we have on which the liability of the company can be put, aside from the liability arising to protect Noble after his peril was discovered and which will be later discussed.

For although it might have been the habitual practice of Noble and other boys about Grays to jump on and ride on moving trains without being invited or permitted, tacitly or otherwise to do so, the company would not be liable if any of them got hurt while so trespassing, unless his place of danger on the train was actually discovered in time to prevent injury to him by the exercise of ordinary care. But when, as in this case, there is evidence to show that boys of immature age and discretion are habitually permitted by the conductor to jump on and ride on moving trains, then the company voluntarily assumes the duty of anticipating that they will do what he has permitted and consented that they might do, and

the further duty of exercising ordinary care to look out for and protect them from injury.

Accordingly we think that the evidence as to the habitual and continued custom of boys jumping on and riding on and jumping off this coal train, and as to the habitual and continued practice of the conductor in permitting them to do so, was competent and put upon the company the duty at the time Noble was injured of anticipating that Noble and the other boys would do on that occasion what they had been in the habit of doing, and the duty of exercising ordinary care to discover their presence on and about the cars, and the duty of exercising ordinary care to prevent injury to them when their presence was, or could by the exercise of ordinary care have been, discovered. And these issues, under the facts of this case, were for the jury under proper instructions.

It may be asked, what is the company to do under circumstances like this to relieve itself from liability for accidents that may happen to boys who make a practice of jumping on its trains? The answer to this is that the railroad company will not be responsible for injuries to boys who jump on its trains unless the train crew permit or encourage them to do so, or unless after they have been actually discovered in a place of peril, the company fails to exercise ordinary care to prevent injury to them. In other words, when the railroad company, through its servants in charge of the train, does not encourage or invite or permit boys to ride on its trains, those who get on will be treated as trespassers and the company only held to the duty that it owes to ordinary trespassers.

A railroad company is no more bound to keep its tracks, cars and premises safe for infants than it is to keep them safe for adults, unless and until by its course of conduct it has established a status for children that imposes upon it more care than it would owe to adults or than it would owe to children except for its course of conduct. And so if a different standard of duty and care is exacted in respect to children from that which is exacted in the case of adults, it is only because the railroad company by its dealings with the children has induced them to believe that they might safely go and be where they do go, and has put before them and within their easy reach things that are inviting and attractive to childish fancy and which they have not sufficient dis-

cretion and understanding to appreciate the danger of meddling about or coming in contact with.

It might also here be observed, that a railroad company has, in section 805 of the Kentucky Statutes, making it an offense for any person except passengers and employes to get on a moving train, an efficient means of preventing trespassing on its trains and cars, although this statute did not interpose a bar to a recovery by Noble, on account of his age and the circumstances attending his injury.

In addition to what has been said, there remains the disputed question as to whether the conductor, when and before he started the train, discovered the presence of Noble riding on or hanging on the step of the coal car, and if he did, what was his duty under the circumstances. This issue we will consider and dispose of as if Noble was a trespasser pure and simple, and as if he had not been invited or encouraged to get on the step or on the car by the previous conduct of the conductor.

Upon this issue there was sharp dispute. According to the evidence of the conductor, which is corroborated by another witness, he did not and could not have seen Noble on the step of the coal car at the time or before he signalled for the train to start; while according to the evidence of Noble, which was also corroborated by other testimony, Noble was in plain view of the conductor when he signalled the train to start and in such a position as that he could not have avoided seeing him. So that it was a question for the jury.

Looking at the matter as if Noble was an ordinary trespasser, the only duty the conductor owed him was to exercise ordinary care to prevent injury to him after his peril was actually discovered by the conductor, and if the conductor saw Noble hanging on the step of this coal car before and at the time he signalled the train to start, it cannot be denied that he must have known that Noble was occupying a place of extreme danger for a boy of his age, and his duty under these circumstances was not to start the train until Noble had been removed from this place of danger. This was the only thing open for the conductor to do in the exercise of ordinary care, and this, assuming that he saw Noble before the train started, he could easily have done.

Another issue in the case relates to the subject of contributory negligence. On behalf of the railroad company

it is insisted that because the evidence of Noble shows that he knew it was dangerous to get on or off of a moving train, and had been warned many times not to do so, as well as whipped for doing it, there should have been a directed verdict in favor of the company, upon the ground that the contributory negligence of Noble was sufficient to defeat a recovery in his behalf.

If Noble had been a man, or a boy of mature years, it might well have been ruled as a matter of law that he voluntarily and understandingly assumed the risk of being hurt when he took this dangerous position, and that he should be charged with such contributory negligence as would bar a recovery. But Noble's negligence in attempting to ride in this dangerous place, or in attempting to get on in this dangerous place, should not, on account of his age, conclusively bar his right of recovery, although he was a bright, intelligent boy, had lived near the railroad all of his life and was as familiar with the operation and movement of trains as any boy of his years and discretion could well be, and knew, as he testified, that it was dangerous to jump on moving trains, and had been warned not to go about them and had been whipped for doing so.

He doubtless knew that if he fell under the train, it would kill him or cut his legs off. But nearly any boy of his age will say, if asked, that he knows if he falls in the river, he may get drowned, or if he falls in the fire, he will get burned, or if he gets in the way of a street car or an automobile, he may be killed, or if he plays with a loaded pistol, he may shoot himself. But mere boyish knowledge of every-day things like these about which children learn almost as soon as they are old enough to walk, does not necessarily imply that they appreciate or understand the necessity for keeping away from or not doing these things.

Boys will light powder with matches; they will fire off dynamite caps with hammers; they will handle with reckless and thoughtless indifference loaded pistols; they will skate on ice so thin that it will scarcely hold them up; they will hang on trains, street-cars and automobiles; climb electric wire poles, play with live wires, and take innumerable and perilous risks in a variety of ways of being crippled or killed that an adult or a boy of mature years would not dare take. They act on impulse, and the greater the danger the greater the fun to

them. They do dangerous things without giving a moment's thought to the consequences that may follow what they do, and to hold as a matter of law boys of eight years old, whether good or bad, bright or dull, to the high standards demanded of men in looking after their own and the safety of others, would be opposed to the good judgment and common sense of all right-thinking people.

And so the mere statement of a boy of eight that he knows a thing is dangerous, or knows it will hurt him, or knows he will be crippled or killed if he does it, is not to be given the meaning it would have if spoken by a mature mind. Knowledge in cases where contributory negligence is in issue, as well as in many others implies age, capacity and experience sufficient to appreciate and comprehend the full meaning and effect of what one does and the consequences that will follow. It is this degree of capacity that the law presumes men and boys of mature years to possess, and accordingly it holds them accountable for their acts; but when it comes to measuring and judging the accountability of children of immature age, it has always been the policy of this court to leave its determination to a jury as a question of fact about which there may be reasonable difference of opinion.

Out of many cases from this court fully supporting this conclusion, we may refer to the following in which it was held that when the child is between six and twelve, the question of his contributory negligence is for the jury, although it may appear that he was warned of the danger of doing what he was doing when injured: City of Owensboro v. York's Admr., 117 Ky. 294; Davis' Admr. v. Ohio Valley Banking & Trust Co., 127 Ky. 800; United States Natural Gas Co. v. Hicks, 134 Ky. 12; Standard Oil Co. v. Marlow, 150 Ky. 647; Trent v. Norfolk & Western Ry. Co., 167 Ky. 319; Macon v. Paducah St. Ry. Co., 110 Ky. 680; Merschel v. L. & N. R. R. Co., 27 Ky. L. Rep. 465.

The further argument is made in behalf of the railroad company that it should not be held responsible for the acts of the conductor in inviting, permitting or encouraging Noble or other boys to get on or ride on the train, although they may have done so, because the rules of the company introduced in evidence showed that the conductor was prohibited from permitting any person to ride on his train without a pass or permit from higher authority; therefore, it is said that if he acted in respect to these boys in the manner testified to by the witnesses,

he was acting entirely outside the scope of his employment and the company was not liable for the consequences of his acts.

We cannot agree with this view of the law as applicable to the case. The conductor was in charge of this train, and Noble and the other boys who were, as some of the witnesses said, encouraged and permitted by him to ride on it, were too young to inquire into, or take notice of, or appreciate, or understand the limits of the conductor's authority. They doubtless took it for granted, as boys might well do, that as the conductor was in charge of the train, he had the right to let anybody ride at any time or in any manner that he saw proper.

Almost every railroad case that we have, or at least a great many of them, grow out of accidents that happen on account of violations of company rules by conductors and other trainmen, and we perceive no good reason why the company should not be held responsible for the acts and conduct of its conductor in permitting children to get on or ride on his train to the same extent that it would be responsible in other instances in which injury or loss is occasioned by the conductor's violation of the rules of the company.

We are also of the opinion that it was competent to show that the father of Noble requested the conductor not to permit him to get on, or ride on, or go about the train, and this upon the ground that it furnished notice to the conductor of the habits of Noble and that the practice he indulged in of trying to ride on the train was against the wishes of his parents.

The instructions are complained of, but according to the views we have expressed, they are free from substantial error. The jury were in substance told (1) that if they believed from the evidence that Conductor Wilder, for some two years or more before Noble was injured, had daily and continuously permitted and allowed, without objection, large numbers of boys, including Noble, to board and ride upon his train in his presence and with his knowledge and during this time numbers of boys, including Noble, did habitually and constantly board the train of Wilder with his permission and acquiescence, then it was the duty of Wilder and the persons in charge of the train on the occasion of Noble's injury to exercise ordinary care to keep a reasonable lookout for Noble, in order to ascertain whether he was on or about the

train, and to exercise ordinary care to avoid injury to him. And if they believed that Noble was injured while exercising ordinary care for his own safety, his age and experience considered, they should find a verdict in his behalf.

(2) They were further told that if they believed that the persons in charge of the train saw Noble on the train, or attempting to get on, and while the same was in motion, and had reasonable grounds to believe that he was then and there in peril, then it was the duty of the persons in charge of the train to exercise ordinary care to avoid injury to him.

(3) Or if they believed that Wilder saw Noble hanging on the side of the train and that he was in danger, and that Wilder, with knowledge of his position, started the train, and failed to exercise ordinary care for the protection of Noble after seeing his peril, if any there was, and should further believe that as a direct and proximate result of the failure of the conductor or other persons in charge of the train to perform these duties Noble was injured, they should find for the plaintiff.

(4) They were further told that unless they believed from the evidence that Wilder habitually permitted and allowed Noble and other infants in large numbers to catch onto and ride on his train, and for such length of time as that it became the common use and habit of Noble and other children, then the defendant company, its agents and servants in charge of the train, owed to Noble no lookout duty, and they should find for the company, unless they believed from the evidence that the persons in charge of the train saw his place of peril before it was started.

On the subject of contributory negligence the jury were told that "If you believe from the evidence that Noble Steele was warned of the danger of getting on, off and riding upon the train in and about Grays, and had sufficient intelligence, judgment and understanding to know and appreciate the danger incident to doing so, yet he persisted in getting on and off and riding said train, such action on his part amounted to contributory negligence, such as bars his right of recovery, and you will find for the defendant company."

Finding in the record no error prejudicial to the substantial rights of the railroad company, the judgment is affirmed.