## Louisville & Nashville Railroad Company v. Reynolds' Administrator.

(Decided October 23, 1931.)

CLEON K. CALVERT, J. G. BRUCE, B. M. LEE, ASHBY M. WARREN, LOW & BRYANT, and J. C. BAKER for appellant.

POPE & HUFF and JAS. M. GILBERT for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

The Louisville & Nashville Railroad Company has appealed from a $6,000 judgment recovered against it by the administrator of Walter Reynolds for the alleged negligent killing of his intestate.

A few minutes after 8 o'clock Sunday morning, November 3, 1929, Walter Reynolds, an 11 year old boy, while attempting to crawl under and between two loaded coal cars, was caught when the cars started, and his left arm and left leg were cut off, from which injuries he died shortly thereafter.

This accident occurred in a mining camp called Kenvir, one of the operations of the Black Mountain Corporation. This camp and these operations are located in the narrow mountain valley of Yocum creek. They are about 2½ or 3 miles in length, and of varying but never very great width. At the point where this accident occurred the railroad tracks run approximately east and west. There is a main track, and, parallel with and near it and each other, two storage tracks.

There were a number of gondolas loaded with coal on these storage tracks that had been there for about 17 hours. There were 41 of these on the storage track next to the main track, but how many were on the other storage track does not appear. About 300 feet east of the place of this accident there is a public road crossing, which all the evidence shows was then unobstructed by these cars or anything else. At the west end of this yard was an engine and scattered along these 41 cars a train crew that had been there for some 40 minutes engaged in coupling these loaded cars together, connecting the air and arranging for their removal.

The Black Mountain Corporation has upon the north side of these tracks a building wherein it conducts a barber shop, pool room, and lunch stand, managed by two of its employees, R. H. Ladd and Grover Adams, the latter working under the former. As Grover Adams came to this place of business on this morning, he was joined on the way and thereafter accompanied by two little boys, his brother Sebree Adams and the little fellow who was later killed, Walter Reynolds. When they reached this building, they found it was closed and the door locked. They knew Mr. Ladd, who lived about 500 feet south of these tracks, had these keys, and the boys volunteered to go after them. After they got these keys they started back to the lunch room. There was a public road leading eastwardly about 500 feet to a public crossing, which the proof shows was then unobstructed, and that crossing led to another road runnning westwardly, by traveling which, for about 350 feet, they would have come to the lunch room. Directly across, from the Ladd residence, it is only about 500 feet to the lunch room, but this route was obstructed by these loaded cars standing on these storage tracks. The boys chose to go the latter route. Between Ladd's house and these storage tracks, they crossed the road we have mentioned, then followed the path that crosses a small stream that parallels these tracks, over which stream there is a foot-bridge. This path then leads east to the scale house, but the boys turned to the west, went along beside these loaded cars for about 20 feet, then started to go under them. They had crossed the first storage track in safety. Walter Reynolds received his injuries in attempting to cross under the cars standing on the second storage track; that is, the one next to the main track. The only eyewitness to the accident was Sebree Adams, the little boy of about the same age, who was with him and here is what he says of it.

"Q. You heard trains pull out, did you not? A. Yes, sir.

"Q. Do you know what kind of noise they make? A. Yes, sir.

"Q. Did you hear any noise like that when Walter stepped under the car? A. Yes, but we thought it was on the other track.

"Q. What did Walter say to you, if anything, about that noise? A. He said, "Let's hurry and get through before the train gets up here.""

"Q. How far behind Walter were you when he said that and tried to go under the train? A. I was about where you are at.

"Q. Two or three steps behind him? A. Yes, sir.

"Q. When you came down before you got to the train, do you remember a little bridge that passed Mrs. Hooker's house. A. Yes.

"Q. You remember the little bridge there as you came from Ladd's? A. There was no bridge, just some planks.

"Q. Isn't there a little bridge there? A. Yes, sir.

"Q. Do you remember crossing over that when you went back to the restaurant? A. We crossed the planks.

"Q. How did you travel, as you crossed over, do you remember whether you walked or ran? A. Walking.

"Q. You did pass over the little bridge past Mrs. Hooker's house before you got to the planks that leads across the ditch, didn't you? A. Yes, sir.

"Q. Who was carrying the key? A. Walter.

"Q. When you got to the end of the planks there was a path leading up towards the tipple, was there not? A. I don't know.

"Q. There is a path right at the end of the planks? A. Yes, sir.

"Q. But you and Walter did not turn up that way towards the scale house but climbed up on the railroad track? A. Yes, sir.

"Q. When you crossed over these two planks instead of turning up the path towards the scale house, you climbed up on the railroad? A. Yes, sir.

"Q. When you crossed the end of the plank next to the railroad, did you go straight to the track or turn to the right or the left? A. Turned to the left.

"Q. How far down the road did you go before you—before he went under the car? A. We went a little piece.

"Q. How far did you travel from the end of the plank down this way before he started under the train? A. Two or three feet.

"Q. Do you remember anything Walter said to you other than what you said about crawling through? A. He said "Let's get through before the train gets up.''

"Q. Do you remember him saying anything else? A. No, sir.

"Q. How close to the wheels did Walter start crawling under the train? A. Right under it.

"Q. Which wheel caught him, the wheel next to the side you were on or the wheel on the other side? A. The side I was on.

"Q. Then he had just started under the car and it caught him right under the first wheel, is that right? A. Yes, sir.

"Q. When you left Ladd's house coming back you crossed over the county road, did you not? A. Yes, sir.

"Q. When you came out of Ladd's house you had to cross over the county road? A. Yes.

"Q. And that road led right along the tracks up to the scale house? A. Yes, sir.

"Q. You knew there is a path along the side of the railroad leading up towards the scale house? A. Yes, sir.

"Q. When you came from Ladd's house past the club house, across the little bridge, you did not go in the path going towards the scale house but you left that path and started across the tracks and started to crawl under the cars? A. Yes, sir.

"Q. That is when Walter told you 'Let's hurry and get through before the train gets up here?' A. Yes, sir.

"Q. Now, Sebree, you told the jury in answer to a question that you thought it was train coming up the main track somewhere—Did you and Walter think the train was coming up the main track? A. Yes, sir.

"Q. State to the jury if you play with the children at Kenvir and have been for four or five years? A. Yes.

"Q. Tell the jury whether or not during the last four or five years before school opened mornings and after school closed in the evening there were or were not children playing on these tracks in front of the clubhouse and the restaurant and these other business houses and it was a common

thing for boys about your size to be crossing these tracks when they wanted to. A. Yes, sir.

"Q. You knew it was dangerous to play on the railroad track did you not? A. No, only when the train is there.

"Q. Have you been told by anybody not to play on it? A. No.

"Q. Let me see if I understand what you mean by train—tell the jury what you mean by saying you did not think it was dangerous when there was no train on the track. A. I mean the engine.

"Q. That is what you call a train—the engine? A. Yes, sir."

Another witness who was near to the place of this accident, saw and heard these children just before the Reynolds boy was hurt, and she says this:

"Q. How were they traveling—fast or slow? A. When they come across the bridge they were in a slow run like a hog, and about the time I looked out and saw these boys I heard the train whistle twice and then this one in front, he said to the one in the back 'come on boys, she is going to pull out,' and began to run fast and ran in behind a coal gon by the side of my house, at the edge of the next house beyond me, and the next thing I heard was the child screaming."

This is the evidence of this little boy when called in rebuttal.

"Q. State to the jury if you or Walter just before you went on the railroad tracks, made the expression, one of you to the other 'The train is about to pull out, come on let's see if we can't beat her across'? A. No."

The remainder of the evidence for the plaintiff is devoted to showing there was no blowing of the whistle or ringing of the bell to indicate these cars were going to be moved; to an effort to show there was a path that led across these tracks at or near the point where this boy was run over; to showing that men, boys, employees, and the public generally walked along and across these tracks, when they were empty as well as when they were filled with loaded cars, in the latter condition the crossing of them was accomplished by going under, over, and between the cars; and to showing there were none of the

employees of the railroad company on or near these cars at or near where the boy was run over. The plaintiff showed by Grover Adams, an employee at this restaurant that he sent this Reynolds boy after the key to the store that morning and had not cautioned him about crossing these tracks. The plaintiff also showed by this witness, that this Reynolds boy had been working about this restaurant, for two or three months, off and on, washing dishes and things, and that Grover Adams, had paid him therefor, the language of Adams being "I'd give him a quarter, or a sandwich or a soda," and it was shown by Adams he was not related to the boy and had no consent from the parents of the boy to employ him. It is admitted that a contract exists between the Louisville & Nashville Railroad Company of the first part and the Black Mountain Corporation of the second part containing the following:

> "And the said second party agrees to place no overhead structure closer than 8 feet from the center of the track and to keep the track free from obstructions; and agrees to hold the parties of the first part harmless from the claims and demands of any and all persons on account of any damage or injuries caused directly or indirectly by the existence, location or condition or any structures or obstructions on said track, or which may either directly or indirectly arise out of the maintenance of said tracks or the operation of the rolling stock on said tracks or the operation of the rolling stock of said parties of the first part on said tracks."

At the conclusion of the plaintiff's evidence the court sustained the motion of the Black Mountain corporation for a peremptory instruction and overruled a similar motion made by the Louisville & Nashville Railroad Company. Thereupon the railroad company introduced its evidence which shows, by some nine or ten witnesses, that, before this train was moved on that occasion, proper signals were given by the blowing of the engine whistle and the ringing of its bell. It also shows by its engineer, conductor, fireman, and brakemen that they had been for about 40 minutes coupling the air, releasing the brakes, and checking up these cars preparatory to moving them, that none of them had seen these little boys at or near the tracks, and none of them saw this accident. There was considerable evidence

about signboards giving danger notices, etc. The trial
court concluded that evidence concerning paths was
immaterial, and after he had admitted some, decided to
admit no more of it. The railroad company renewed its
motion for a peremptory, it was overruled, and case sub-
mitted with the result stated.

At this point we shall state there is considerable
confusion in this record about whether this train was
moving backwards or forwards when this boy was run
over. This is only a confusion of terms; there is no con-
fusion of fact. The engine was at the west end of this
group of cars; the engine was headed east; the cars were
attached to the pilot of the engine and when moved were
moved to the west; thus the engine was backing up, and
these cars were drawn, not pushed, when the boy was run
over. That was a forward, not a backward, movement of
the train. A train is moving forward when it is being
drawn by the engine and backwards when the engine is
pushing it.

The court should have directed a verdict for the
railroad company; the plaintiff had not shown any facts
to justify the submission of the case to the jury.

In arriving at this conclusion we have proceeded
as if it were established that a path existed across these
tracks at the point where this boy was hurt; indeed we
shall presume it to be shown to be a concrete pavement
of suitable width for use by the public, and that the public
had used it with the knowledge of the railroad company
of that use. What would the rights of these parties then
be? The only difference between such an imaginary
crossing and a public one is the railroad company could
obstruct it when, and keep it obstructed as long as, it
saw fit, for we said as much in Ky. Central R. Co. v.
Gastineau's Adm'r, 83 Ky. 119, in which opinion this
court used this language and these italics:

"A railroad company has the right to the ex-
clusive use and occupation of its yard or track,
except at crossings or such places as the public are,
by law, authorized to use; otherwise, it could not
properly perform its duties to the public. It is not
required to anticipate the intrusion of others; and
one who enters upon them without right, does so
at his peril; and, in case of injury, can not recover,
unless it was wantonly inflicted after the danger
was discovered. Its duty to such a person or a

trespasser is merely negative—it must not, when it knows of the peril, act maliciously or with a disregard of obvious consequences. It is not required to use care to *anticipate and discover* the peril to such a person, but only to do so after the discovery of the danger. Until then no legal duty is imposed upon it, because no one, by a wrongful act, can impose a duty upon another.''

What would the rights of these parties be if plaintiff had made his case even as strong as the one we have supposed?

This boy under such circumstances would have the right to use such a crossing to get across these tracks, the railroad company would also have the right to use it in moving its cars to and fro on these tracks. Both would have rights to use this crossing, but they could not use it at the same time. The railroad company would be required before it attempted to use such a crossing to see if the boy were using it and to give him time to finish his use of it before it began the use of it, and in like manner the boy would be required to see if the railroad company were using the crossing and to give it time to complete its use of it before he attempted to use it. Each would have the right to presume the other would not interfere while he or it was using such a crossing. Each would have to look before beginning the use of it, but after the use was begun each could presume the other would not interfere. Each would have to exercise ordinary care in all these things. If the railroad company had a train of cars standing over such a crossing, that would be a use of the crossing. It had such in this instance, and the boy knew it, for he did not go straight ahead in blind obliviousness of the presence of the cars, but in conscious knowledge of their presence he attempted to crawl under them, and was hurt while so doing.

The railroad company would have to look out for this boy until it began the use of such a crossing. After it began its use (in this case it had been using this place for 17 hours), this lookout duty ceased, and it owed this boy no duty unless and until it discovered his peril, in which event it was its duty under the ''humanitarian doctrine,'' sometimes referred to as the ''last clear chance doctrine,'' and as the ''rule in Davies v. Mann,'' 19 Eng. Rul. Cas. 190, to avoid injuring him if it could do so by the use of ordinary care in the use of the means

it had at hand. In this case the railroad company owed no lookout duty, even if it be conceded this was an established crossing, when the boy attempted to use it, while the railroad company was using it; hence his administrator cannot recover unless the railroad company or its agents and servants discovered his peril in time to avoid injuring him, and of this there is no proof whatever.

The plaintiff has no evidence to support the cause of action he alleged. The contract between these two defendants does not change the rights of the plaintiff. The case of L. & N. R. Co. v. Steele, 179 Ky. 605, 201 S. W. 43, L. R. A. 1918D, 317, contains nothing in conflict herewith. By three of the instructions in that case Noble Steele, an 8 year old boy, who was injured in alighting from a coal train on to the side of which he had been swinging, was permitted to recover if the persons in charge of the train saw his peril and failed to use ordinary care to avoid injuring him, and by another instruction the court applied the lookout duty rule under circumstances sharply circumscribed. The jury was required before applying the lookout duty rule to believe from the evidence that the particular conductor (in charge of the particular train by which, in the commission of a trespass thereon, Steele was injured) had allowed him and others like him for two years or more to commit daily and continuously similar trespasses in his presence and with his knowledge. In the case at bar, Conductor Yeary testifies that this was the first time he had been in there in charge of a train for three or four months, that he had not been back there as a conductor since, and has not as such been in there more than three or four times altogether.

Thus it will be seen there is a broad distinction between the status of Conductor Wilder in the Steele case and Conductor Yeary in this one. The rule in the Steele case is perfectly sound when restricted as it was there, but it is not a rule this court is inclined to extend, as will be seen from the case of Mucci v. Hazard Blue Grass, etc., 212 Ky. 268, 278 S. W. 589, where we were invited to extend it but declined.

These tracks were constructed at a place where there is a curve in this valley and there is a corresponding curve in the tracks. The northern side is the inside of this curve; the southern side is the outside. The conductor and brakemen were on the northern side in order

that they might see each other and communicate their signals from one to the other and to those in charge of the engine. The little boy approached these storage tracks from the southern side; that is, the outside of the curve. Thus we have the evidence of the members of this train crew that they did not see this boy and also the physical obstruction that made it impossible for them to see him. The untimely death of this little fellow is much to be regretted, but there is no evidence to fix responsibility therefor upon the L. & N. R. Co. See L. & N. R. Co. v. Hocker, 111 Ky. 707, 64 S. W. 638, 65 S. W. 119, 23 Ky. Law Rep. 982, 1274; Ill. Cent. R. Co. v. Broughton, 78 S. W. 876, 25 Ky. Law Rep. 1752; So. Ry. Co. v. Thomas, 92 S. W. 578, 29 Ky. Law Rep. 79; Jones v. Sandy Valley & Elkhorn R. Co., 181 Ky. 539, 205 S. W. 576; So. Ry. Co. v. Clark, 105 S. W. 384, 32 Ky. Law Rep. 69, 13 L. R. A. (N. S.) 1071; Brackett's Adm'r v. Louisville & Nashville R. Co., 111 S. W. 710, 33 Ky. Law Rep. 921, 19 L. R. A. (N. S.) 558; American Dist. Tel. Co. v. Oldham, 148 Ky. 320, 146 S. W. 764, Ann. Cas. 1913E, 376; McQuary v. L. & N. R. Co. (Ky.), 128 S. W. 329; Age's Adm'r v. L. & N. R. Co., 148 Ky. 219, 146 S. W. 412; Koke's Adm'r v. Andrews Steel Co., 149 Ky. 627, 149 S. W. 968; Treadway's Adm'r v. L. & N. R. Co., 217 Ky. 1, 288 S. W. 1060; L. & N. R. Co. v. White, 221 Ky. 1, 297 S. W. 808; C. & O. Ry. Co. v. Daniels, 227 Ky. 470, 13 S. W. (2d) 509.

There is but one Kentucky case that is apparently not in harmony with these and that is the case of Trent v. N. & W. Ry. Co., 167 Ky. 319, 180 S. W. 792. In that case this court had before it a claim for injuries sustained in the state of West Virginia, and necessarily the rights of the parties were determined by the laws of that state.

In Sweat's Adm'r v. L. & N. R. Co., 178 Ky. 825, 200 S. W. 14, the facts in the Trent case were distinguished from the facts in that case, and again in C. & O. Ry. Co. v. Daniels, 227 Ky. 470, 13 S. W. (2d) 509, the facts were held so different as to make the Trent case inapplicable. These two cases show the Trent case to be an extreme case, and it is not of controlling authority except where the same facts are presented. In the case at bar we again find the facts are different and the Trent case not controlling, even under the extreme state of facts we have supposed to exist. Trent was injured at a public crossing, and one which was not the private prop-

erty of the railroad company and which it had no right to obstruct for an unreasonable length of time, whereas the place this boy was hurt was one in which the rights of the public were, to say the most, the rights of licensees only, and this crossing, if indeed a crossing existed at all, was one the railroad company could obstruct as long as it saw fit, and, when it did obstruct it, that was a withdrawal for the time of all rights of the public to use it, and, when they attempted to use it while it was thus obstructed, they were simply trespassers.

A great deal has been said in briefs about contributory negligence, but we see no need to discuss that, as no negligence of the Louisville & Nashville Railroad Company had been shown and in the absence thereof no responsibility for this boy's death rests upon it; hence it was entitled to a directed verdict in its favor.

Therefore the judgment is reversed.