## Louisville & N. R. Co. v. Mischel's Adm'x.

(Decided Feb. 25, 1938.)

ASHBY M. WARREN and THOMAS E. SANDIDGE for appellant.
LOUIS I. IGLEHEART and GEORGE S. WILSON for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Reversing.

Appellee, administratrix of the estate of Mary Generose Mischel, was awarded damages in the sum of $7,000 against appellant, on account of the death of her daughter, due as alleged to the negligence of appellant. By petition and amended petition it was alleged that about 2 a. m. December 17, 1935, while riding in an automobile driven by R. D. Payne, the auto collided with a freight car standing directly across highway No. 60, causing intestate's death. The crossing was described as being an infrequently used switch track, crossing the highway into properties of the Glenmore distillery. It was said the crossing was dangerous because of "surrounding willow trees, shrubbery and signboards, and a curve in said highway at said point, so as to darken and obstruct the view of the traveler at night, approaching the said crossing * * * All of which endangered the safety of the traveling public."

The petition alleged that it was a dark, foggy night, and there was "no light upon or about the freight car," thus the plaintiff's intestate was unable to see the car standing on the crossing, "which car the defendant grossly and negligently permitted to remain, without giving the driver of the car or his guest any warning or signal with lights or otherwise, so as to warn them of the presence of the car."

It was alleged that the driver and his companion were exercising ordinary care at the time of the accident, and that intestate had no control over the operation of the automobile.

Appellant answering, denied the allegations of the petition and pleaded contributory negligence. Upon a hearing the jury returned a verdict as above stated; motion for a new trial was overruled, and judgment entered, from which this appeal is prosecuted.

At the point where the accident occurred, three switch tracks cross highway No. 60 at right angle, running generally north and south. The main line is a mile south of the crossing, and the Glenmore and

Standard Oil plants are on the north side of the highway; one of the properties being east and the other west of the tracks. The right of highway at the point described, and at all points involved, is approximately 68, and the concrete pavement, 18 feet in width. The lines of the distillery property are flush with the highway right of way line. As the highway, going towards Owensboro, approaches the crossing it is straight for more than 1,300 feet. On each side of the highway and switch tracks there was the regulation cross-arm, bearing the words "Railroad Crossing," and on each side of the tracks, and in the highway, were painted white stripes and "R. R." in large letters. At the corner of the Glenmore property, and on the north side of the track, was an electric light of 700 watt power, swung about 10 feet higher than an ordinary box car; this was lighted at the time of the accident. The main entrance to the distillery property was about 600 feet east of the crossing.

Decedent was twenty-two years of age, a graduate of a business college. Payne, the driver of the automobile, was also a student at the business college, and about twenty years of age. It had been a custom of the school to entertain students and alumni with a pre-Christmas party. On the afternoon of December 16, Payne and Miss Mischel had, with others, been engaged in decorating the hall at Rio Vista, a road house where the entertainment was to be held. After completing arrangements, they drove home in Payne's car, and later back to Rio Vista, where they remained until the entertainment was over, about 1:30 a. m. Payne and his companion, with others, decided to and did go to Oriental Inn. The parties remained there, engaged in dancing, not more than fifteen or twenty minutes, whereupon Payne and decedent left in his car, followed shortly by others of the party. Oriental Inn was about 2 miles east of the crossing in question. Payne says that after he left the Inn he drove towards Owensboro at a rate of 25 or 30 miles an hour. As he approached the crossing, there were a lot of willow trees on the Glenmore side of the highway, and on the left, signboards and one or two trees. He testified that approaching the crossing, "if there had been a train up that track on the switch, headed southward, these obstructions would have prevented one from seeing it." The night was dark and

foggy and it had been drizzling rain. After he left the Inn, he put on the lower beam of his headlight so he could "see a lot better." He explained that the lower beam threw the light more directly on the surface of the road, but for a distance of 40 feet less than would have been thrown by the upper beam. He said that as he neared the entrance to the distillery property, "The trees made it darker, and it was foggy, and drizzling rain; I took my foot off the accelerator and the car slowed down, probably five miles an hour, and I was very careful as I got close to the train, and I saw the track where the lower beam hit, and I slammed on my brakes and cut to the left; I slowed down some, but it was too late." Further, he said he put on his brake after he discovered the car across the highway, when he was "just about 30 feet away from the car." The "shoving down of the brake slowed the car. The street was moist, and it did not have as good effect as if it had been dry. * * * There was no light between me and the box car; it was pitch dark." Asked, "What caused you to run into the car?" he answered:

"Because it was so dark and I had my lights on, was driving carefully, and I did not expect a train there. I knew there was a switch there. I never heard anybody say there was a train there, and that puzzled me and I slowed down and shoved on the brakes, but there wasn't any light there at all. There wasn't any light anywhere that I saw."

He said he thought the switch had been abandoned. On cross-examination witness said he thought his brakes slowed him down to about 18 miles an hour; that he was probably 150 feet above the Glenmore entrance when he noticed smoke, which he says he "knows now was from the train, but I didn't know where it was from then." He said he was kept from seeing the train by the smoke around the train, the willow trees, and sign board, none of which obstructions were on the highway right of way. He thought with his dimmers on he could have seen the car at a distance of 50 feet, but not as far as 100 feet.

Payne stated that he struck the car on the left side from him. He explains this by saying that when he was about 30 feet from the car he swerved to the left, thinking it would "help slow down some more." That after he turned to the left he skidded, as he thought, about 15

feet. Payne was dazed by the impact to such an extent that he know nothing much as to what had happened until the next morning, when he awoke in the hospital. The impact resulted in the instant death of Miss Mischel.

Others of the party who left the Inn and followed Payne's car testified that as they approached the crossing they observed the stop light on Payne's car, and some one remarked, "Dubie didn't get across." This observation was made, and the light observed as witnesses' car passed the main entrance to Glenmore. These parties saw no other light. They say the night was dark and foggy, and one witness said, "Smoke was close to the ground." Another witness said that the smoke was from the train and not the distillery. They also testified as to the presence and position of the trees, shrubbery, and signboard.

A dairyman, who had traveled the road frequently, testified that, "The railroad track makes a little curve there; there is a big coal pile and some willows all along the fence row, and a box car could not be seen if you were coming from the east, and those trees are up high enough to keep from showing the light on Glenmore corner." He also said that there were 550 people at work at Glenmore who "used the crossing," and that Owensboro had a population of 35,000, and a great many trucks pass over this crossing. This witness admitted, as did others who testified as to the trees, shrubbery, and signboards, that the curve mentioned in pleading and proof was more than 1,000 feet from the crossing point, and that for such distance the road was perfectly straight, with nothing in the road to obstruct the view. A witness who had left the Inn, following Payne's car, testified that some one in his car called out, "Look out, there is a train," and stopped in about 30 feet, and very near the car.

The engine foreman, switchman, and brakeman were on the ground west of the crossing, or the right side of the engine and cars. The engine was about six car lengths from the blocking car, or 260 feet south of the crossing. As the cars were being backed in to make the coupling, the foreman was standing in the crosssing. One of the employees who was to make the coupling was on the same side, but on the north side of the highway.

The other was on the same side of the crossing, but nearer the engine for the purpose of passing signals. The foreman flagged the crossing, and just before the crossing was closed he saw a car rounding the curve, which he judged to be half a mile away. Very shortly, and as the switchman was making the coupling, the foreman heard the crash; went through to the east side of the crossing, and found that the automobile had struck the south (left) end of the seventh box car, and was "jammed" into and under the trucks. The automobile door was partly open, and Payne "fell into the fireman's arm." The other two employees came over to the east side at once and assisted Payne, who could not tell them whether or not there was any one else in the car. They then went to the automobile and found decedent "crumpled up under the dash-board." An ambulance was called at once and removed the injured parties to the hospital. The proof shows that the automobile was so "jammed" into the trucks of the car that the train could not be moved until a wrecker had extricated it.

The trainmen admitted that no one was kept at this crossing to flag travelers, but that it was always flagged, as it had been on this occasion, when switching was done. These witnesses say that it was a dark, cold night; it was not raining. Describing the automobile after it was removed, it was said the windshield was broken, the frame of the car so bent that it dragged on the concrete. The upholstering was torn loose from the rear seat. They all say that the automobile was coming toward the box car on the left side, as was evidenced by definite skid marks, made by one wheel of the automobile, as far back as about 80 or 90 feet. The speedometer pointed to the figures "55."

A night watchman of the Glenmore distillery making his rounds happened to be between tracks 1 and 2 at the time of and just before the impact. He was on the east side of the car as it stood on the crossing, and on the north side of the highway. He had been speaking to the foreman who was flagging the train in the middle of the highway. He heard the auto coming up as the car got across the highway, and turned to look "and about that time they hit." He estimated that he saw the automobile about 200 feet west of the main entrance to Glenmore. He described the condition of the

weather as clear and "fairly cool." Another watchman leaving the main entrance of the Glenmore plant saw the car across the track, and the automobile passing him. His attention was drawn to the automobile because "it was going so fast, and I didn't think he could stop between there and where the train was." He heard the brakes "screak and slide," and then the crash. He thought the automobile was going from 35 to 40 miles an hour.

On appeal it is contended by appellant that (a) the court erred in overruling its motion for a peremptory instruction; (b) gave erroneous instructions, and refused to give instructions offered by appellant; and (c) the verdict of the jury was flagrantly against the evidence.

We have determined, as we view all the evidence, it is only necessary to consider the question as to whether or not the appellant under the proof was shown to have been guilty of negligence. If it is not so shown, the answer is obvious, for if the injury resulted solely from the negligence of the driver of the automobile, appellant is not liable for damage. Winston's Adm'r v. City of Henderson, 179 Ky. 220, 200 S. W. 330, L. R. A. 1918C, 646; Barnes & Bro. v. Eastin's Adm'r, 190 Ky. 392, 227 S. W. 578; Payne, Agent, v. Barnette's Adm'r, 196 Ky. 489, 244 S. W. 896; Louisville & Nashville R. R. Company v. Jameson's Adm'x, 214 Ky. 552, 283 S. W. 1026; Stephenson's Adm'x v. Sharp's Ex'rs, 222 Ky. 496, 1 S. W. (2d) 957.

The pleadings are based on the theory, and proof was introduced to show that the crossing was a dangerous one, because of the presence of trees and signboards, so situated as to obstruct the view of one approaching the crossing, without sufficient light to warn a traveler. Other evidence introduced as bearing on the claim that the crossing was dangerous consisted of proof that Owensboro was a city with a population of about 35,000; the distillery plant employed about 500 persons, and the highway at this point was much traveled.

The law applicable here must be determined from the facts relating to the place and its condition or situation at the time of the accident. This is not a case where injury was caused by a moving train, operators of which

had failed to warn the traveler by blowing a whistle, ringing a bell, and (in some instances) observing the "lookout" requirement. Here we have a box car across the highway, at a place where its owners and operators had the right to have it, and where, as shown by the proof, it had been standing for an appreciable length of time. The dangerous quality of the crossing must be measured by the situation and condition as shown by the facts, and when such a situation is presented (as here), one crossing can hardly be said to be more dangerous than another, unless the geographical or topographical situation makes it so, as was apparently the case in Coil's Adm'x v. Chicago, St. L. & N. O. Railway Company, 232 Ky. 33, 22 S. W. (2d) 428, and Louisville & Nashville Railway Company v. Mahoney, 220 Ky. 30, 294 S. W. 777. These cases are distinguishable. In the first-named case the traveler, in approaching the track upon which a train was running, "ran through a cut which concealed a view of the railroad, and then he came over a hill close to the railroad crossing."

In the Mahoney Case the proof showed there was a sharp turn in the highway very near to the crossing, so that it was well-nigh impossible for the traveler to see a train until almost reaching the track. However, as we read that case (and it is to some extent relied upon by appellee), the court upheld the verdict mainly on the ground that a wig-wag signal, which had theretofore been in operation, and this operation known to and relied upon by the traveler, was not working at the time of the accident. However, all the proof in this case goes toward showing and does show that the highway was perfectly straight for a distance of more than 1,000 feet east of the crossing in question. The proof also shows that the right of way was 68 feet in width, the traveled portion being 18 feet wide. It is inconceivable how the shrubbery, trees, or signboard described constituted an obstruction to the view of the traveler approaching the crossing. In fact, it is difficult to construe the testimony of witnesses testifying on this point as tending to show that the presence of the alleged obstructions had aught to do with the accident in question. We can conceive, as was intimated by the witness Payne, that if a train or engine be moving from either of the plants, one approaching from the east might have difficulty in seeing it before nearing the crossing; the

same might be said of a train approaching from the south, but we have neither situation. Before negligence can be attributed to appellant, it must be satisfactorily shown that it violated some duty owed to a traveler in an automobile under the existing circumstances and conditions.

It is contended by appellee that the appellant, under the facts shown, should have placed servants on each side of the train with lights, so as to warn travelers, or have adopted some other (not shown) method to notify travelers that a train was standing across the highway. We are cited to no authorities which would lead us to attempt to lay down a rule embodying that principle. It is not argued that appellant failed on the occasion to have or give all signs and warnings required by statute. Sections 786, 773, Kentucky Statutes.

After some search, we have been unable to find in our jurisdiction cases which discuss the precise question here presented. However, there appear to be many in other jurisdictions, which, due to the peculiar similarity of facts, seem to be conclusive.

In Crosby et al. v. Great Northern Railway Co., 187 Minn. 263, 245 N. W. 31, 32, plaintiff, a guest, was injured by the automobile being driven by another coming into collision with a train on a crossing near a village; the accident occurred at 9:45 p. m. It was argued there that the conditions and environment required the railroad company to use extra-precautions, in supplement to such as were required by statute. The court, after holding that signals and warnings were required for the purpose of preventing approaching trains from running into travelers, said that such were not required to prevent automobile drivers from running into the side of a standing or moving train. In that case the court held that the defendant was engaged in a lawful business, conducted in a legitimate way, and that reasonable operation did not require lights on the side of each of its cars, whether moving over a crossing or standing thereon. The court said:

"Common experience is that the occupation of a highway crossing by a train is visible to travelers on the highway including automobile drivers whose cars are properly equipped with lights and who exercise ordinary care. It would seem that a train

upon a crossing is itself effective and adequate warning. It has always been so considered. This is so whether the train is moving or standing. A railroad company is under no obligation to light an ordinary highway crossing at night so that its trains thereon may be seen by travelers."

In Gage v. Boston & M. Railroad, 77 N. H. 289, 90 A. 855, 856, L. R. A. 1915A, 363, the alleged accident occurred at 11 p. m. on a dark and foggy night. It was contended that on account of weather conditions plaintiff was unable to see the train until too late to avoid striking it. It was also claimed that the railroad company was negligent in failing to have gates, lights, or a crossing tender, while the crossing was occupied by the train. The court, in holding contrary to such contention, said:

"When cars are upon a crossing under such circumstances the fact that they are there is a sufficient warning to the traveler upon the highway that he cannot occupy the crossing at the same time. No other signals or warnings are necessary or required in the absence of a statute imposing such a duty upon the railroad. As there is no statute or municipal regulation requiring the defendant to provide lights at this crossing the mere fact that there were none on the night of the accident does not prove the negligence of the defendant. * * *

"The defendant's cars were rightfully occupying the crossing, and the trainmen were exercising due care, so far as the management of the train in approaching and passing over the crossing is concerned. The plaintiffs were not injured by being run into by the defendant's locomotive, but by running into the defendant's freight car as it was slowly passing over the crossing. * * * If it is conceded that the trainmen were chargeable with knowledge that automobiles were frequently driven over the crossing in the evening, were they also chargeable with knowledge that they were liable to be driven at such a rate of speed that they could not be stopped before reaching the crossing after the cars upon it became visible? * * *

"The trainmen in the case at bar were justified in acting upon the assumption that an automobile

would not be unnecessarily driven into the side of their train. * * *

"In order to charge the defendant, it must be found from some substantial evidence that its servants, in the exercise of ordinary care, would have understood that they were maintaining at the crossing an obstruction which, on account of the darkness, was a dangerous obstruction to people riding in an automobile, driven at a reasonable rate of speed and equipped with strong lights. To hold that such evidence exists in this case is to overturn the rule that a verdict based upon conjecture cannot stand."

In a recent case, Dolan v. Bremmer, 220 Iowa 1143, 263 N. W. 798, 800, wherein a guest sought recovery for injury caused by the driving of an automobile at night (between 8 and 9 p. m.) during a heavy fog, and wherein recovery was denied, the court said:

"We think the railroad company would be justified in assuming that, if there was a mist or fog upon the highway, the driver of the car in which appellee was riding would reduce his speed so that he would not travel into or through such mist or fog at any greater rate of speed than would enable him to stop within the distance in which he could see objects ahead of him. * * *

"Railroad tracks necessarily cross public highways, and it is necessary that trains at times be stopped upon such public highway crossings. When this is done and the railroad company is making reasonable and legitimate use of such crossing, the presence of the train itself is sufficient warning to any one using the highway, and there is no duty upon the part of the railroad company to anticipate that one using the highway will not see such train and be apprised of its presence as fully as he would be if other signs or warnings were used."

In Butters v. Chicago, M. St. P. & P. Railway Company, 214 Iowa 700, 243 N. W. 597, 601, plaintiff was a guest, the car being driven into a side of a train at a crossing, on a dark night. The contention of plaintiff there was the same as appellant's here, and in answer the court said:

"There is no contention that these precautions

would be necessary in the daytime, or at any time when the occupation of the crossing by one or more cars would be visible to a traveler in time to allow him to stop before reaching the crossing. When cars are upon a crossing under such circumstances the fact that they are there is a sufficient warning to the traveler upon the highway that he cannot occupy the crossing at the same time. No other signals or warnings are necessary or required in the absence of a statute imposing such a duty upon the railroad.''

The court further said:

''We are of the opinion that the employees of the appellant as reasonable men had the right to assume that, under all the circumstances shown by this record, the occupation of the crossing by these box cars would be visible to a person who was driv-along the street in an automobile properly equipped with lights, and who was keeping a constant lookout ahead, in time to allow such person to stop before coming into collision with the cars, and consequently that the proof in this case fails to show negligence on the part of the appellant.''

The principle announced in the above quotation is the law in this jurisdiction. In the recent case of Cincinnati, N. O. & P. R. Railway Company, v. Wallace's Adm'r, 267 Ky. 661, 103 S. W. (2d) 91, 94 we wrote:

''The operators of the train have the right to believe that the one who is only potentially approaching danger will desist from his course and avert it before actual peril is created, and which desisting, ordinary prudence on his part requires and demands.''

There are cited quite a number of cases in that opinion, declaring the principle above announced.

Without further quoting authorities upholding the principle announced, supra, there may be added as applicable, convincing, and conclusive of the question here presented the following: Morley v. Cleveland, C. C. & St. L. Railway Company, 100 Ind. App. 515, 194 N. E. 806.; Philadelphia & R. Railway Company v. Dillon, 1 W. W. Harr. 247, 31 Del. 247, 114 A. 62, 15 A. L. R. 894; Orton v. Pennsylvania Railway Company, 6 Cir., 7

F. (2d) 36; Coleman v. Chicago, B. & Q. Railway Company, 287 Ill. App. 483, 5 N. E. (2d) 103. We might add as having some bearing, Louisville & Nashville Railroad Company v. Reynolds' Adm'r, 240 Ky. 662, 42 S. W. (2d) 911, and Louisville & N. R. Co. v. Adams' Adm'r, 205 Ky. 203, 265 S. W. 623.

After a careful review of the cases cited, which we think clearly lay down the law as applicable in such a situation as is here presented, we are compelled to hold that there is a lack of showing of any negligence on the part of appellant such as would constitute the proximate cause of the injury. Having reached such conclusion, it becomes unnecessary to discuss whether or not the guest was negligent. A recovery could only be had of appellant on a showing of actionable negligence on its part; none having been shown, the court should have directed a verdict for appellant. All questions not discussed are reserved, and the judgment is reversed with directions to grant a new trial consistent herewith.