BELVA D. DIMOND v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—141 S. W. (2d) 789.

Division One, June 28, 1940.

334

*Carleton S. Hadley, Walter N. Davis* and *Arnot L. Sheppard* for appellant.

*William R. Schneider* for respondent.

DALTON, C.—This is an action for compensatory and punitive damages on account of personal injuries sustained by plaintiff when the automobile in which she was riding as a guest collided with one of defendant's trains. The automobile struck a coal car near the center of a long freight train, as the train moved slowly over a railroad crossing on Highway No. 3 in the Village of Monsanto, a suburb of East St. Louis, Illinois.

Plaintiff in one count charged defendant with "willful, wanton, reckless and malicious acts of negligence and carelessness," in knowingly maintaining the crossing without suitable warning devices and methods of notifying motor vehicle travelers of the presence of defendant's train across the highway at said crossing. It was alleged that defendant knew, or by the exercise of ordinary care should have known, that the crossing was dangerous and constituted a danger trap to motor travelers, by reason of certain street lighting and other conditions prevailing there, but, notwithstanding such knowledge, negligently, carelessly, willfully, wantonly and recklessly failed to maintain a watchman or flagman, crossing gates, automatic electric signals or danger lights, or warnings at the crossing; that defendant negligently and wantonly failed to sound the whistle or ring the bell or to station a brakeman at the crossing with a lantern; and that defendant negligently, carelessly, willfully, wantonly and recklessly violated an Illinois statute providing that all railroads shall construct all grade crossings and approaches thereto "so that at all times they shall be safe as to persons and property." Defendant's answer was a general denial and a plea of contributory negligence in

failing to look and listen, and in failing to warn the driver of the presence of the train. Citations and statements as to the law of Illinois were included in the answer. On trial, a jury returned a verdict for plaintiff for $40,000 actual damages and $10,000 punitive damages, a total of $50,000, on which judgment was duly entered. After motion for a new trial was filed and overruled, the defendant appealed.

Appellant assigns error on the overruling of its demurrer to the evidence at the close of the whole case. It is contended (a) that there was no substantial evidence of appellant's negligence, (b) that the respondent was guilty of contributory negligence as a matter of law preventing recovery, and (c) that appellant's negligence, if any, was not the proximate cause of respondent's injuries.

The question presented is whether or not, under the law of Illinois, the evidence was sufficient to make a submissible case of actionable negligence by appellant in failing to give any warnings in addition to the presence of the freight train across the crossing and the existing signs and warnings given. A careful statement of the evidence in a light most favorable to respondent is, therefore, required.

Illinois Highway No. 3 extended north and south through the Village of Monsanto. It was paved with concrete, with a black line marking the center. Appellant's tracks extended east and west, crossing the road at right angles. For more than a mile and one-half south of the crossing, the highway was straight and level, and extended through level country. The Alton and Southern tracks crossed the highway about one-half miles south of appellant's crossing. Between the two crossings there were no buildings or other obstructions on either side of the highway, except the city hall of the Village of Monsanto. The city hall was located 50 to 60 feet east of the highway pavement and about 175 feet south of appellant's crossing. North of the crossing, and on the east side of the highway, there were no buildings within 350 feet of the crossing. On the west side of the highway and north of the crossing was a small filling station, but located so as not to obstruct the view.

The crossing was marked on each side with the usual crossarm signs. The sign on the south side of the crossing was located 10 feet east of the pavement and 20 feet south of the tracks. This sign was made of two boards approximately 5 feet in length and mounted on a post 10 to 12 feet high. The boards were painted white with black letters. On one board were the words ''Stop, Look and Listen,'' and on the other, ''Railroad Crossing.'' The white background was ''a little bit dirty.'' On the east side of the highway, 300 to 500 feet south of the crossing, was the usual standard highway railroad crossing sign. This sign was painted yellow and had stripes on it and two large black letters, ''R. R.'' The sign was about 18 inches in diameter and located 4 feet east of the pavement.

There was no testimony concerning the condition of the crossing itself. From the pictures offered in evidence, it appears to have been the usual type of crossing, the rails level with the pavement, and with no grade on either side. No watchman, flagman, gates or signal lights were provided at the crossing.

Highway No. 3 was paved in 1925, and thereafter in 1928 or 1929, the Village of Monsanto installed a system of high candle power street lights along the highway. The lights extended one-fourth mile north and three-fourths of a mile south of appellant's crossing. The lights were located on the east side of the highway and suspended over the east edge of the pavement. There was also a light west of the highway and north of the filling station. The parties agreed that the lights were incandescent electric lights, each of 1000 candle power; that the light immediately south of the crossing was 70 feet south of appellant's tracks and was 20 feet above the highway; that the first light immediately north of the crossing was 152 feet away and was mounted 23 feet above the highway; that these two lights on either side of the crossing were 222 feet apart; that the average distance between the other lights up and down the highway was 300 feet; that these lights were mounted about 20 feet above the highway; and that all lights were installed under and pursuant to an ordinance of the Village of Monsanto, Illinois.

The evidence further showed that the lights were ''General Electric Novalux;'' that they were very lightly flashed with opal glass, not completely transparent, with ten to fifteen per cent flashing; and that as one traveled north on the highway at night all of the lights ahead of him would be visible, together with a double row of elevated lights on the ''Free Bridge'' and the lights of the cities beyond. The evidence does not show the elevation of the eastern viaduct approach to the bridge, nor the elevation of the lights thereon, nor the distance of this bridge from appellant's crossing. In the pictures taken at night to show the general location of these lights, the bridge lights appear at about the same elevation above the highway, whether in pictures taken near appellant's crossing or in pictures taken 350 feet south of the Alton and Southern crossing one-half mile further south. The street lights created alternate light and dark spots along the highway, it being very bright immediately under the lights and much darker between them. These light and dark spots were clearly visible to one traveling the highway at night.

Respondent, a guest passenger in a 1929 Chevrolet driven by one Bruns, was traveling north on Highway No. 3 at about 30-35 miles per hour. The time was 1:30-3 o'clock A. M. Respondent was in the rear seat. The automobile brakes were in good condition. The headlights were burning and cast their light 50-75 feet ahead. There was no traffic on the highway. The weather was clear and cool and

the pavement dry, and the automobile could have been stopped within 50 feet.

Bruns testified that his eyesight was good; that he was looking ahead; that he observed the light and dark spots on the pavement produced by the series of lights; that he could not see into the dark spots from the light spots, but that he continued to run his automobile at 30-35 miles per hour; that just after he left the light places his automobile headlights would light up the dark places, but that he didn't know exactly how far he could see; that he could see the black line down the highway; that he knew when he was in the vicinity of the Alton and Southern crossing, and when he crossed it; that he did not stop or slow down for it; that as he moved northward along the highway, he saw the overhead lights, and knew he was near the Monsanto city hall, and in the vicinity of, and approaching, appellant's crossing; that he knew the crossing was marked with crossing signs; that he had been over the crossing 8 or 10 times in the preceding eleven years; that he had crossed only once in the last 4 or 5 years, and that was 2 weeks before the collision, when he was traveling at night in the opposite direction; that he had never seen a train on the crossing but knew that trains used the tracks; that he had purchased gasoline at the filling station just north-east of the crossing a long time ago; that on this occasion he did not see the crossing nor either of the crossing signs, nor the city hall; that he did not slow up or stop for the crossing; that he could not tell just where it was; that he saw no occasion to stop; that no one in the automobile said anything to him about stopping; that he did not see the train on the crossing until he struck it, until the moment of impact, when a dark object appeared before him; that the crossing was in a dark place; that he had seen the rest of the dark places along the highway and knew when he was approaching this one; and that the only reason he knew why he didn't see the train, was ''on account of those dark spots.'' He did not testify as to whether, while traveling the highway, he observed the lights of the Free Bridge, and the lights of the city beyond.

Respondent testified that she had operated an automobile for over ten years; that she knew they were traveling about 30 miles per hour; that the automobile did not slow down after they turned on to the highway 2 miles south of the crossing; that she was looking ahead; that her eyesight was good and she could see ''a long ways'' ahead; that she could see the highway lights and the pavement; that she observed light and dark spots on the highway and had observed them before; that she could see the black line on the pavement; that she had gone north on the highway at night on other occasions; that of three occasions she recalled, the first was more than a year before; that she knew when they crossed the Alton and Southern crossing and that the driver did not slow up or stop; that as they went on she

knew they were in the Village of Monsanto; that she knew they were in the vicinity of appellant's crossing; that she had seen the crossing and knew of its existence; that she had seen the crossarm sign on several occasions and knew it was there, and that it said, "Stop, Look and Listen;" that she had been looking ahead all the time, but did not see the sign on this occasion; that she thought that anyone could see an object in the dark spots, with the automobile lights, but there didn't seem to be any objects on the road; that she didn't know of anything to prevent her from seeing a train or anything on the road; that she didn't see anything to cause her to warn the driver to slow up; that she could see the lights above the highway and could see straight ahead; and that she didn't see the train across the highway until they struck it. Neither respondent nor Bruns was asked whether they heard any signals or the noise of the train, if any.

Respondent offered no evidence as to whether, at the time of the collision, the train was standing still or in motion. There is no contention, however, that it was stopped on the crossing or had been there too long. Respondent's evidence disclosed that immediately after the collision the train was stopped with a lowsided black coal car partly over the crossing. The automobile was then west of where the collision had occurred but the back end of it was still on the highway. Two bodies had not yet been removed from the automobile. The train extended both ways from the crossing. The engine was more than 600 feet to the west and cars extended east as far as the witness could see. (Appellant's evidence tended to show that the train contained 61 cars and was moving slowly west over the crossing at 3-4 miles per hour; that the automobile hit the 26th car; that the collision broke the "train line," and "the air set the brakes," and stopped the train.) At the time of the collision the train was "in No. 2 yards of the Wiggins Ferry" and the train was across two motor vehicle highways. The coal car involved in the collision had a 4-5 foot body and stood about 8 feet high. The automobile hit to the right of the center of the car.

An electrical engineer and lighting expert, who had carried on a series of experiments and had made a study of the most efficient method of lighting streets and highways so as to produce the greatest visibility through lighting effects, testified that in his opinion the lighting scheme in operation along Highway No. 3 at appellant's crossing was not "very conducive" to show up or make "very visible" a black coal car upon the crossing. He said that as you approached one of the lights, the light emitted would hit the pupil of your eye and contract it; that as you would go down the highway the pupil of your eye would open and close from time to time; that when the pupil was closing, you could not see beyond the light ahead of you; that the mounting height of the 1000 candle power lamps should have been higher and the spacing closer "to make effective illumination for

visibility'' and avoid glare; that in order to light the highway "in the most effective manner and in order to obtain the highest degree of visibility over a highway area,'' the mounting height should have been 30 feet; that the spacing between the lights, in view of the type of glassware used for the lights, should have been not over 180 feet to get "reasonable uniformity of light'' and avoid light and dark spots and bad visibility; that this principle of highway lighting was a well recognized principle; that respondent's Exhibit 4, a picture taken 900 feet from appellant's crossing showing the highway at night with light and dark spots and the lights at intervals, "did not show a very effective lighting scheme;'' that the objection to such type of lighting was that it tired the eye very rapidly, since the eye constantly opens and closes to adjust itself to the illumination of the road; that railroad tracks approximately half way between lights would not be visible at all until you got well past the bright light and your eye had had a chance to readjust itself; that in view of the admitted locations of the lights about the crossing, and height of mounting and intensity of these lights, a black coal car on the crossing would be practically invisible until the motorist was in such a position that the light between him and the coal car was shielded by the top of the automobile; that one traveling north on the highway would run up to within 25 feet of the light south of the crossing, or 95 feet from the tracks, before the light would be shut off by the top of the automobile; that it would take perhaps a second for the eye of the average person to readjust itself; that at 30 miles per hour (45 feet per second) you would have to pass the light 30 or 40 feet before your eye readjusted itself "so you could see visibly up to the next light;'' that after you passed the light 25 or 30 feet your visibility would be all right for the next 100 feet or so, and then the next light would begin to catch your eye; that once you were under the light and had the light out of your eyes, you could probably see white lettering on a coal car; that you would probably get an outline of a box car or passenger car silhouetted against the lights beyond; that you would probably be not more than 50 feet away from the crossing before you could see distinctly; that a dark coal car would not become visible to the motorist, distinctly visible, until after he had practically passed the center of the light spot in the road; that when he was 50 to 60 feet south of the light located 70 feet south of the crossing he could not see a dull black train on the crossing; that the principle of lighting and lighting effect on the eye was similar to that created when a person stands in a well lighted room at night and looks out of the window to see what is outside; that the crossarm crossing sign would probably have been visible, but not nearly as definitely as it appeared in respondent's pictures taken from a position 175-200 feet south of the crossing; that a black object will absorb light while a white one reflects it; that the glare created by the light imme-

diately south of the crossing would interfere "quite seriously" with your vision of the crossarm signs, even though they were painted white; that red lights of sufficient intensity, placed 4 or 5 feet above the ground on either side of highway, would certainly be visible, although it would be doubtful whether a tail light would be visible, since it is a very small lamp; that a light of 150 candle power in proper reflectors would be visible, in view of the lighting conditions existing at the crossing; that in traveling the highway the automobile lights would help the driver in the dark spots, after passing the light, but would be very ineffective under a light or immediately beyond a light, since they would not be powerful enough; that automobile head-lights, ordinarily 6-8 candle power, would not be effective until the eye readjusted itself from the bright light and adjusted itself to the headlights; and that it was like going into a moving picture show in the afternoon; until the eye readjusts, which isn't instantaneous, one has difficulty in finding a vacant seat.

On April 23, 1935, and subsequent to the date of the collision (April 14th), the president and board of trustees of the Village of Monsanto passed a resolution reciting that appellant's crossing "has become and is extremely hazardous and dangerous." It recited that five collisions had occurred at the crossing in less than a year and that several persons had been killed and others injured. It authorized and directed the president and the attorney of the village "to immediately take such steps as are necessary to bring about the protection of the public at the crossing." A copy of the resolution was offered in evidence. A copy of the resolution had been sent to appellant, and respondent offered in evidence a letter from appellant's president, acknowledging receipt of a copy of the resolution as follows:

"Receipt is acknowledged of your letter of April 24, with copy of resolution passed by the President and Board of Trustees of the Village of Monsanto under which you are directed and instructed to immediately take such steps as are necessary to bring about the protection of State Bond Route No. 3 crossing of our track in the Village of Monsanto.

"The necessity therefor was recognized some time ago, and since the Division of Highways, Department of Public Works and Buildings, State of Illinois, had an appropriation; and indicated a willing-ness to protect certain grade crossings, the crossing in question was included in a number requiring protection, and a contract was entered into with the Department providing for such protection.

"The attention of Director Robert Kingery was called to the accident that occurred on April 14th, with the request that the in-stallations provided for in the contract be made promptly, and an early reply requested. Pursuant thereto I have sent your com-munication to Mr. Kingery, with the further request that the pro-

tection provided for in the contract be installed without further delay.''

Subsequent to the date of this letter and prior to the trial of this cause a blinking lighting system with two red lights was installed on each side of appellant's crossing and the overhead light 70 feet south of the crossing was turned off, but the record does not show by whom this was done.

There was evidence that, as one approached appellant's crossing from the south, the lights on the Free Bridge and the highway lights beyond the crossing gave the appearance of a clear highway until one was close enough to see a train, if one was on the crossing, but the witness who gave this information said that one could see a train on the crossing 300 to 400 feet away. There was other evidence that the lights beyond the crossing and on the bridge would be cut off from view, as one approached from the south, in accordance with and depending upon the height of the railroad cars on the crossing, if a train was there, and upon the nearness of the motorist to the train at the time. There was evidence that a high box car would cut off the view of these lights beyond the crossing, when one, approaching from the south, was within 200 feet of the crossing, but that they would still show between the cars; that these lights would not be cut off from view by a low car or a flat car. There was also evidence that one traveling south, and approaching the crossing from the north, could see a train on the crossing much easier, better and sooner than one approaching the crossing from the south. Respondent pleaded and offered in evidence a section of the Illinois statute requiring railroads to construct and maintain all grade crossings and approaches thereto ''so that at all times they shall be safe as to persons and property.''

Chief of Police Reeves, respondent's witness, testified with reference to conditions surrounding the crossing as follows: ''The street lights, the distance they are in the air, and the other lights from different industries, and the lights from the Free Bridge, all shining on the windshield, they obstruct the vision in front of you.'' On cross-examination, he stated that he had approached the crossing in question. in an automobile and under the same conditions which existed on the night of respondent's injury; that he had tested the matter out many times and that, on approaching the crossing in an automobile from the south on a clear night, one could see a train crossing the crossing when about 700 feet south of the crossing; and that on a cloudy night a train on the crossing was visible for 200 feet from the south. He said, ''I have tried it in all different weather and climate conditions, and up to 200 feet, I have never been able to drive up there but what I could see a train 200 feet away.'' Appellant used three police officers of Monsanto who testified that on approaching the crossing from the south in an automobile at night, when

conditions were the same as they were at the time respondent was injured, one could see a train on the crossing for more than 300 feet south of the crossing. (Two said 300 to 400 feet and one said 500 to 600 feet.)

Two of respondent's pictures, taken at night from a point 175-200 feet south of the crossing, show a freight train on the crossing. The train shows in the pictures as a dark shadow or streak, silhouetted against the lights beyond, but respondent's witness who took the pictures testified that you could see the train better with the naked eye than it showed in the pictures. Respondent's attorney, a witness for her, testified that he could and did see the train from where the pictures were taken, but stated that after the headlight of the engine had passed it was exceedingly difficult to see the train itself from that point.

Appellant's trainmen testified that the whistle was sounded for the crossing and the bell rung, and for the next crossing to the west, and that the bell was ringing at the time the automobile collided with the train, but that the engine was then over 1000 feet west of the crossing. One of the police officers testified that he was in the city hall and heard the train; that the bell was ringing and the whistle was blown for the crossing; and that after the engine passed he could hear the noise of the cars rolling along the track immediately prior to the collision.

Respondent concedes the general rule to be that a person who drives, or is driven into, the side of a train standing or moving over a grade crossing at night cannot, *in the absence of special circumstances rendering the crossing peculiarly hazardous,* recover from the railroad company for injuries received; and that *ordinarily* the presence of a train upon a crossing is adequate notice to travelers that the crossing is preempted and, consequently, no additional signs, signals or warnings are required. [Coleman v. C., B. & Q. Ry. Co., 287 Ill. App. 483, 5 N. E. (2d) 103, 105 (reviewing many cases) ; Miles v. American Steel Foundaries, 302 Ill. App. 262, 23 N. E. (2d) 754, 756 ; Capelle v. Baltimore & O. Railroad Co. (Ohio St.), 24 N. E. (2d) 822; Crosby v. Great Northern Ry. Co., 187 Minn. 263, 267, 245 N. W. 31, 32.]

Respondent's position is that the crossing in question was extra hazardous and unusually dangerous in view of its environment; that it was a trap type crossing; that the lighting system on Highway No. 3 made it very difficult to see a train upon the crossing; that the lights beyond the crossing created the illusion that the crossing was open, when it was occupied; that the general conditions and circumstances surrounding the crossing were such that the existence of the crossing, and the presence of a train thereon, would not be revealed to a motorist traveling the highway and exercising ordinary care for his own safety; and that appellant was fully advised of the circum-

stances, conditions and dangers at the crossing, but negligently, willfully and wantonly failed to provide additional signals or warning.

In the case of Wagner v. Toledo, Peoria and Western Railroad, 352 Ill. 85, 185 N. E. 236, relied on by respondent, the court held that, "there is a common-law duty devolving upon railroads to exercise such care and use such precautions as will enable a traveler on a highway, if he exercises ordinary care, to ascertain in the nighttime the approach of a train over a street crossing." It was further held that where special conditions create special hazards at a crossing a watchman, gates or other warning to travelers may be required in the exercise of ordinary care; that if the crossing is of an unusually dangerous character, a railroad company may be guilty of negligence in not maintaining other means of warning the traveling public, although it has fully complied with statutory warnings and signals, and that the rule that one crossing a railroad track must approach it with the amount of care commensurate with the known danger cannot be applied if the conditions are such that the existence of the track would not be revealed to one in the exercise of ordinary care.

The courts of Illinois, therefore, recognize an exception to the general rule that a train upon a crossing is adequate notice to all of its presence. An exception exists, when in view of the special conditions, general surroundings, and warnings given, the presence of the crossing, and of a train thereon, would not be revealed to a traveler, who is in the exercise of ordinary care for his own safety. [Chicago, B. & Q. Railroad Co. v. Perkins, 125 Ill. 127, 17 N. E. 1, 5; Willett v. Baltimore & O. Railroad Co., 284 Ill. App. 307, 1 N. E. (2d) 748, 751 (4).]

■ Whether or not there was any evidence of negligence on appellant's part, in failing to provide additional warnings, depends upon the facts and circumstances shown by the record with reference to the particular crossing. A railroad is not required to have a gate or flagman or brakeman, or to maintain signals and lights at every crossing of a highway, but only at such places as may be regarded as reasonably necessary for the protection of travelers. What might be considered as reasonably necessary for such protection at one crossing might be deemed wholly needless and unnecessary at another, in each case depending upon the amount of travel upon the highway, the frequency with which trains passed over it, upon the view which could be obtained of trains as they approached the crossing, or moved over it, and upon other conditions. Whether an issue of fact is made for the jury depends on the evidence in the particular case. [Homan v. Mo. Pac. Ry. Co., 334 Mo. 61, 64 S. W. (2d) 617, 622.] The burden of proving the special conditions which would require appellant, in the exercise of ordinary care, to provide special protection for motorists upon the highway rested upon respondent. The extent of traffic on this highway is not shown, and we may not infer that the

traffic is heavy from the mere fact that it is a paved highway near East St. Louis. The frequency of trains using the crossing is not shown. The evidence indicates one round trip, and occasionally two, by this train crew over the crossing each night to bring freight out of the Cotton Belt yards. The amount of other train service, if any, does not appear. There is no evidence that the train whistle was not sounded for this crossing, and for the crossing further west, or that the bell was not rung in accordance with the testimony of appellant's witnesses. No statute or municipal regulation requiring warning lights, gates, or a watchman at the crossing, is claimed or cited. It is admitted that the crossing was level; that the railroad crossed at right angles; and that the view was not shut off in any direction by physical obstructions. The train, a long freight, was on the crossing, and there is no evidence that it had stopped before the collision took place. There is no contention that it was not rightfully occupying the crossing at the time of the collision. No negligence in that regard is alleged. It is admitted that on each side of the crossing were the usual crossarm crossing signs, the one on the south being ten feet east of the pavement, twenty feet south of the crossing, fifty feet north of the first street light south of the crossing. The sign was mounted eight-ten feet lower than the street light and bore the words "Stop, Look and Listen. Railroad Crossing." There is no evidence that it could not have been seen by a motorist in the exercise of ordinary care. Still further south was the regular state highway marker for crossings. Respondent offered no evidence that this marker was not visible or that the crossarm sign could not have been seen for a long distance south of the light seventy feet south of the crossing. (Appellant's evidence was to the effect that both could be seen at night.) The crossarm sign shows clearly in respondent's pictures of the crossing taken at night from a point 200 feet south of the crossing, but there was some evidence that to the naked eye it would not have been nearly as definite as it appears in the pictures, since the glare of the over-head light would have interfered with the eye more than with the camera. We have reviewed the evidence showing that both respondent and Bruns knew of the existence of the crossing, knew how it was marked, and knew its general location. They both knew they were in the Village of Monsanto and were approaching the crossing. They knew that they were in the vicinity of the crossing. It is true that both respondent and Bruns testified that their eyesight was good; that they were looking ahead; and that they did not see any of the signs, nor the train on the crossing until the moment of impact. The mere fact that they did not see the train, admitted to have been on the crossing at the time, is no evidence of negligence by appellant, if the train could have been seen by one in the exercise of ordinary care. No witness testified that the train could not have been seen in time for the automobile to

have been stopped. No witness suggested that the train could not have been seen prior to the moment of impact.

There is little real conflict in the evidence, except with respect to the extent to which visibility of a train on this crossing was affected by the highway lighting system in effect on Highway No. 3.

■ We have seen that respondent's expert testified that, under the hypothetical facts existing at the crossing, with the candle power of the highway lights, height of mounting and distance from the crossing, the driver of an automobile, approaching from the south, would not be able to see a train on the crossing until his eyes were shaded from the overhead light 70 feet south of the crossing; that this would take place 25-30 feet from the light, or about 95 feet from the crossing. He estimated that at 30 miles per hour, or 45 feet per second, the automobile would be within about 50 feet of the train before the driver would be able to see distinctly a black coal car. He said that 50 to 60 feet south from the light you could not see a train on the crossing.

The expert's testimony was not the result of tests and experiments made under the same or similar conditions as existed on the night of the collision. His testimony was merely his opinion, conclusion, and estimate of what experiments and tests would show under the facts submitted to him. Necessarily all factors and conditions affecting visibility at this crossing on the night of the collision could not be submitted to him as a basis for his opinion. His evidence as to the distance within which a train on the crossing would become distinctly visible to an approaching traveler was merely an opinion or estimate. It was not controlling in view of actual tests made by approaching the crossing in an automobile at night, and under the same or similar conditions which prevailed when the collision occurred. [Luettecke v. City of St. Louis, 346 Mo. 168, 140 S. W. (2d) 45; Mann v. Phoenix Brick & Const. Co., 151 Mo. App. 586, 132 S. W. 19; Maxwell v. Kansas City, 227 Mo. App. 234, 52 S. W. (2d) 487, 490; 22 C. J. 561, sec. 658.] Under the circumstances disclosed by the record the opinion of the expert as to low visibility was insufficient to sustain the verdict on that theory. [Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739, 753 (20); Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S. W. (2d) 664, 672. ] We think the lighting expert's opinion that a train could not be seen on the crossing when a motorist was approaching from the south until the automobile was 95 feet south of the crossing and the motorist's eyes were shaded from the first light, and not then until his eyes had time to adjust, was of no probative value in view of the actual tests made by respondent's witness Reeves, and in view of other evidence offered by respondent.

■ The evidence failed to show that the lighting system, the

lights on the Free Bridge, and other lights beyond the crossing, created the impression of a clear highway and made a "danger trap" for travelers on the highway so that in the exercise of ordinary care for their own safety they would approach so close to a train on the crossing that they would be unable to stop and avoid a collision. There was no substantial evidence tending to show that any motorist or other traveler upon the highway, in the exercise of care for his own safety, had been previously deceived or trapped by said condition into approaching so close to a train upon the crossing that he could not stop. In view of all the evidence in the record, considered in a light most favorable to respondent, and with the lighting system and lights beyond the crossing as they existed, there was no duty on appellant to anticipate that one using the highway, and exercising ordinary care for his own safety, would not see the crossing signs and observe the presence of the train upon the crossing and be fully advised of its presence as he would be if other and additional signs and warnings had been provided. Appellant was not an insurer of respondent's safety. The evidence was not sufficient under the circumstances, to warrant a finding by the jury that the exercise of ordinary care by appellant required additional warnings. [Cash v. N. Y. Central Ry. Co., 294 Ill. App. 389, 393, 13 N. E. (2d) 1012; Cleveland, C., C. & St. L. Ry. Co. v. Gillespie, 96 Ind. App. 535, 173 N. E. 708, 712; New York Central Ry. Co. v. Gardner (Ind. App.), 24 N. E. (2d) 811; McParlan v. Grand Trunk Western Ry. Co., 273 Mich. 527, 263 N. W. 734; Reines v. C., M. & St. P. Ry., 195 Wash. 146, 80 Pac. (2d) 406, 408 (reviewing authorities and classifying state decisions); Texas & N. O. Ry. Co. v. Compton (Tex. Sup.), 136 S. W. (2d) 1113; Trask v. B. & M. Railroad, 219 Mass. 410, 106 N. E. 1022; Mo. Pac. Railroad Co. v. Hood (Ark.), 135 S. W. (2d) 329; New York Central Ry. Co. v. Casey, 214 Ind. 464, 14 N. E. (2d) 714, 716; Butters v. Chicago, M. St. Ry. Co., 214 Iowa, 700, 243 N. W. 597, 601; Dolan v. Bremner, 220 Iowa, 1143, 263 N. W. 798; Bledsoe v. M., K. & T. Ry. Co., 149 Kan. 741, 90 Pac. (2d) 9, 16; Chesapeake & O. Ry. Co. v. Switzer, 275 Ky. 834, 122 S. W. (2d) 967, 968; Louisville & N. Railroad Co. v. Mischel's Admx., 272 Ky. 295, 114 S. W. (2d) 115; Gage v. Boston & Maine Railroad Co., 77 N. H. 289, 90 Atl. 855, 856; Killion v. Chicago, M., St. P. & P. Ry. Co. (Ind. App.), 25 N. E. (2d) 647; Thomson v. Stevens (Iowa, C. C. A. 8th C.), 106 Fed. (2d) 739; Sisson v. Southern Ry. Co., 68 Fed. (2d) 403, 62 App. D. C. 356.]

Respondent insists that appellant's president by his letter admitted that the crossing was extra hazardous and unusually dangerous and that additional protection was required. We do not so construe the letter. Respondent in this case charged that the crossing was extra hazardous and unusually dangerous on account of particular circumstances and conditions referred to in her pleadings and

evidence. ·The letter was not written in reply to the charges made in respondent's petition, but to acknowledge receipt of a copy of a resolution by the Board of Trustees of the Village of Monsanto. The resolution stated no facts showing the crossing to be extra hazardous for any of the reasons stated in respondent's petition. The statement, that the crossing "has become and is extremely hazardous and dangerous," was a mere conclusion. The resolution did not disclose whether the collisions, therein mentioned, had happened in the daytime or at night, nor did it indicate that they were caused by the lighting conditions or any inability to see trains on the crossing. The fact that accidents had happened at the crossing, or that automobiles had collided with trains on the crossing, did not show that appellant's negligence caused or contributed to produce them. The parties whose negligence caused or contributed to the collisions were not designated. The mere fact that collisions took place was equally consistent with the absence, as with the existence, of negligence on the part of appellant. [Chicago City Ry. Co. v. Rood, 163 Ill. 477, 45 N. E. 238, 240; Bledsoe v. Missouri, K. & T. Ry. Co., supra, .90 Pac. (2d) 9, 14.] Evidence of other accidents at the crossing did not tend to establish the negligence here charged against appellant. There was nothing in the resolution or letter to indicate that when a train was upon the crossing at night it would not be adequate warning to all travelers in the exercise of ordinary care for their own safety that the crossing was occupied. Nor was such proof made at the trial. The letter was not an admission that appellant knew the crossing was extra hazardous or unusually dangerous while a train was upon it, nor on account of the facts alleged in respondent's petition, nor on account of low visibility and deceptive conditions sought to be established by respondent. The resolution made no such charge. The letter was not an admission that appellant was negligent in any respect with reference to said crossing. In addition, "need for protection" would ordinarily mean need of methods or means of warning the traveling public of the approach of the train over the crossing. Such seems to be the rule in Illinois. "The office of a flagman and of gates and of lights is to warn travelers of approaching trains. It is not the duty of a flagman to hold the heads of horses while a train passes or to wave his flag while the train is passing." [Fuller v. P. & P. Union Ry., 164 Ill. App. 385, 387; Coleman v. C., B. & Q. Railroad Co. 287 Ill. App. 483, 489; Crosby v. Great Northern Ry. Co., supra; New York Central Railroad Co. v. Casey, supra.]

We hold that said letter in reply to the receipt of a copy of the resolution was neither an admission that the hazards contended for by respondent existed in fact, nor evidence that appellant knew of such hazardous conditions, nor were the facts stated in the resolution any evidence of negligence by appellant in the respect here charged.

There was other evidence that there had been collisions at

the crossing at night, but the mere fact that two or three automobiles had hit trains on this crossing at night during a period of years was no evidence that an unusually dangerous condition existed there. There was no proof that any of these accidents happened under the same or similar conditions and from the causes here alleged. In other words, there was no evidence of any similar occurrences.

█ Respondent insists that the evidence disclosed a trap type crossing; that the highway lighting system, the lights on the Free Bridge and other lights beyond the crossing, shining on the windshield of an approaching automobile obscured the vision and created the impression that the highway was clear so that a train upon the crossing would not be seen in the exercise of ordinary care. However, the witnesses who furnished this evidence said that a train could be seen upon the crossing by an approaching motorist from the south for 200 to 700 feet south of the crossing and nothing else in their testimony contradicts that fact. Where there are no contradictions, the evidence of the witness must be considered as a whole and in the setting in which the particular evidence is given. [State ex rel. Gosselin v. Trimble et al., 328 Mo. 760, 41 S. W. (2d) 801, 804.]

Respondent insists that appellant had known for some time that this crossing "was in need of protection from dangers of a deceptive type of situation," which actually misled motorists into thinking the crossing was clear and lured them into danger. This contention is not sustained by the record.

█ Much is said about the evidence as to subsequent repairs. The installation of the blinking light system after this collision and the disconnection of the first light south of the crossing was insufficient to prove negligence by appellant in failing to provide additional warnings of the presence of the train upon the crossing. [Grubb v. Ill. Terminal Co., 366 Ill. 333, 341, 8 N. E. (2d) 934.] Such evidence did not tend to prove, either that the crossing was extra hazardous and unusually dangerous while a train was thereon, or on account of the matters set out in respondent's petition, or that appellant knew thereof prior to respondent's injury. [Derrington v. Southern Ry. Co., 328 Mo. 283, 40 S. W. (2d) 1069, 1072; Wallingford v. Terminal Railroad Assn. of St. Louis, 337 Mo. 1147, 88 S. W. (2d) 361, 367; 45 C. J. 1234, sec. 792.]

The respondent relies particularly upon the following cases: Wagner v. Toledo, P. and W. R. R., supra; Roshel v. L. & N. Ry. Co. (Mo. App.), 112 S. W. (2d) 876; Beaumont, St. L. & W. Railroad Co. v. Richmond (Tex. Civ. App.), 78 S. W. (2d) 232; M., K. & T. Ry. Co. v. Long (Tex. Civ. App.), 23 S. W. (2d) 401; Licha v. N. P. Ry. Co., 201 Minn. 427, 276 N. W. 813; Elliott v. Mo. Pac. Ry. Co., 227 Mo. App. 225, 52 S. W. (2d) 448, 451; Richard v. Maine Central Railroad Co., 132 Me. 197, 168 Atl. 811; Christensen v. Willamette

Valley Ry. Co., 139 Ore. 666, 11 Pac. (2d) 1060; Short v. Pennsylvania Ry. Co., 46 Ohio App. 77, 187 N. E. 737.

We cannot review the facts in these cases without unduly extending this opinion. It is sufficient to say that the facts and circumstances shown in this case differ in essential respects from the facts under consideration in said cases.

In view of the conclusion we have reached that the evidence was insufficient to make a submissible case against appellant on the theory of negligence in failing to provide additional warning devices at the crossing, it is unnecessary to consider the question of contributory negligence or proximate cause, or to review other assignments of error. It follows, also, that since a case was not made for the jury on the grounds that the crossing was extra hazardous and dangerous on account of the matters alleged or that appellant knew thereof prior to the collision, no case was made for the jury on the issue of willful and wanton misconduct. The court therefore erred in refusing appellant's demurrer to the evidence as offered at the close of the whole case.

The judgment is reversed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.