ERMAL REEVES v. GUY A. THOMPSON, Trustee of the MISSOURI PACIFIC RAILROAD COMPANY, Appellant.—No. 40411.—211 S. W. (2d) 23.

Division One, May 10, 1948.

848.

*Thos. J. Cole, D. C. Chastain, Ray L. Shubert* and *H. E. Sheppard* for appellant.

*Crouch & Crouch, Dan Boyle, Arthur C. Popham, Sam Mandell* and *Popham, Thompson, Popham, Mandell & Trusty* for respondent.

■ BRADLEY, C.—Action for personal injury; verdict and judgment went for plaintiff for $22,500; defendant appealed.

Plaintiff's right arm was severed at the elbow by defendant's freight train at Napoleon, Missouri, about 3:30 A. M., May 23, 1942. The cause was filed May 9, 1946, and tried February 5, 1947. The negligence alleged was (1) that the train was operated without a headlight; (2) at a high, dangerous and reckless rate of speed; and (3) failure to sound whistle or bell or give other warning of the train's approach to the crossing on which plaintiff was struck. The answer was, in effect, a general denial and also a plea of contributory negligence. The cause was submitted on all grounds alleged except the second.

Error is assigned (1) on overruling defendant's motion for a directed verdict at the close of the case; (2) on plaintiff's instruction No. 1; (3) on the alleged misconduct [25] of plaintiff's counsel; and (4) that the verdict was the result of passion and prejudice and is excessive.

Defendant makes two contentions respecting the motion for a directed verdict. First, it is contended that plaintiff's evidence as to how he was injured was completely nullified by contradictory statements to defendant's claim agent and to plaintiff's father. Second, defendant contends that plaintiff was guilty of contributory negligence as a matter of law. These questions are interrelated, but we dispose of them separately and in the inverse order. First, was plaintiff guilty of contributory negligence as a matter of law? Plaintiff (respondent) resided at Lexington, Missouri, but was employed on a Government boat at Napoleon. His hours were from 12 noon to 12 noon the following day; then he was off for 24 hours. If the work was not too heavy he slept some on the boat, and plaintiff said that he slept "a lot" on the previous night. On the day before the night of injury plaintiff worked until noon; arrived home, Lexington, about 1:30 P. M.; slept until about 6 o'clock. Plaintiff's father operated a filling station at Napoleon and slept in the station. On the night of injury plaintiff went from Lexington to Napoleon with William Martin in Martin's car. He had taken a few beers in Lexington, but the evidence was that he was not intoxicated. Plaintiff's father had asked him to bring him (the father) a quart of whiskey and plaintiff did that, and that is his excuse for going back to Napoleon that night. Plaintiff and Martin arrived at Napoleon between 1 and 3 o'clock A. M., and plaintiff awakened his father and remained at the filling station until shortly before he was injured.

Napoleon is on the River Route of the Missouri Pacific from Jefferson City to Kansas City, and about 12 miles west of Lexington. At

Napoleon the railroad runs approximately east and west. Government enigneers have a supply depot and supply yards at Napoleon on the Missouri River. A state highway extends east and west through Napoleon. The railroad tracks are between the highway and the supply depot and yards of the Government engineers. There is a road extending north and south over the railroad tracks from the south side of the tracks to the supply depot and yards. There are three railroad tracks. The main line is the south track, next north is the passing track, and then a switch track to the supply yards. The passing track is about 8 feet north of the main line and will hold about 85 cars. The passing track connected with the main line 4 or 5 car lengths west of the road leading to the engineers' depot and yards, and connected with the main line about 80 car lengths east of this road. Defendant's westbound freight of 118 cars and his eastbound freight passed each other at Napoleon on the night of plaintiff's injury. According to defendant's evidence the westbound train pulled onto the passing track and up to the west end thereof and there stopped; about 33 cars were left on the main line; the eastbound train on the main line track moved into the space between the east and west switches of the passing track and stopped; then the westbound train moved west and onto the main line track; when the cars at the east end of the westbound train cleared the east switch, the eastbound train proceeded on east. In railroad parlance this was called "sawing by." The inference from plaintiff's evidence is that the westbound train stopped on the passing track before it reached the crossing to the Government depot and yards, or that the eastbound train cleared this crossing before the westbound train on the passing track reached it.

A man by the name of Matheney who resided in Lexington was night watchman at the Government depot and yards. Plaintiff left his father's filling station to see Matheney to arrange for a ride to Lexington. The filling station is south of the tracks and south of the state highway, and a short distance west of the road to the Government engineers' depot and yards. Plaintiff testified that when he arrived at the railroad track the eastbound train was moving over the crossing; that he stopped 10 or 15 feet south of the track until this train cleared the crossing and that he then started walking across and that when he came up to the passing track he looked both east and west before going on the track, but saw no "headlight evidencing a train [26] was there"; that when he was about the center of the passing track he heard a noise; he thought "more noise than the other train" and looked up and the westbound train on the passing track "wasn't over 10 feet, right on me"; that "there was a large black object right on me"; that the headlight was not on; "no headlight was burning"; that no bell or whistle was sounded or any warning of any kind given; that when he was about the center

of the passing track and saw the train right on him he threw himself backwards, but "didn't clear myself"; that he was hit "mostly on the right leg and hip"; that he "got hold of the train"; didn't "know what part"; but it was "something on the front of the engine"; that he held on for about 200 feet. "I couldn't hang on any longer and I let loose"; that the train cut off his right arm at the elbow. The father testified that shortly after plaintiff left to see Matheney he had occasion "to step outside" and that when he stepped out he heard some one "moaning and hollowing", and found plaintiff.

Defendant's evidence was that as the westbound train moved west on the passing track "facing this train" (the eastbound) the headlight on the westbound train was dimmed. Plaintiff's father who had, in prior years, worked for the Missouri Pacific for 23 years as a laborer, section hand as we understand, and for a time was section foreman at Napoleon, testified that it was the custom to "turn off headlights when meeting another train." George Shull, engineer on the westbound train, testified that there were number plates about 12 x 8 inches "on each side" of his engine; that there was a light on these plates connected "with the dynamo" and that these lights "will show" whether the headlights are on or off; that these lights could be seen for "at least a block." He also said there were no railroad yard lights at this crossing.

In support of the contention that plaintiff was guilty of contributory negligence as a matter of law, defendant cites State ex rel. Hines v. Bland et al. (Mo. Sup.), 237 S. W. 1018, l. c. 1019; Hayden v. Missouri-Kansas-Texas R. Co., 124 Mo. 566, 28 S. W. 74; Henderson v. St. Louis-San Francisco Ry. Co., 314 Mo. 414, 284 S. W. 788; State ex rel. Kansas City Southern R. Co. v. Shain et al., 340 Mo. 1195, 105 S. W. (2d) 915; Burge v. Wabash R. Co., 244 Mo. 76, 148 S. W. 925; Morrow v. Hines (Mo. App.), 233 S. W. 493; Dimond v. Terminal R. Assn., 346 Mo. 333, 141 S. W. (2d) 789; Zickefoose et ux. v. Thompson, 347 Mo. 579, 148 S. W. (2d) 784; Fitzpatrick v. K. C. Southern Ry. Co., 347 Mo. 57, 146 S. W. (2d) 560. In each of these cases it appears that the one whose duty it was to look either did not look at all, or did not look at a time when to have looked would have been to see. In neither of these cases the facts and circumstances were not such as here. The question here is, Should it be held as a matter of law that plaintiff's looking was so careless and inefficient as to amount to no looking at all?

"In a case where to look is to see and a plaintiff, having a duty to look, says he did not see, it is presumed he failed to look or looked so carelessly or inefficiently as to amount to not looking at all." Rhineberger v. Thompson, 356 Mo. 520, 202 S. W. (2d) 64, l. c. 68. "A failure on the part of a plaintiff, where a duty to look exists, to

see what is plainly visible, when he looks, constitutes contributory negligence as a matter of law." State ex rel. Kansas City Southern Ry. Co. v. Shain et al., supra, 340 Mo. 1195, 105 S. W. (2d) l. c. 918. For the convenience of the reader, we here repeat the salient parts of plaintiff's evidence. He said that when he came up to the passing track he looked both east and west before going on the track; that he saw no "headlight evidencing a train was there"; that no headlight was burning; that no bell, no whistle or warning of any kind was given of the train's approach; that when he was about the center of the passing track he head a noise, looked up and the westbound train was not over 10 feet away, right on him; "there was a large black object right on me." The eastbound train had just cleared the crossing and noise from that train was yet present. It was in the night time; there was no moon; there were no railroad yard lights near the crossing. The "large black object" that was "right on" him would suggest that there was no headlight or other light on the engine. Savage [27] v. Chicago, R. I. & P. Ry. Co. et al., 328 Mo. 44, 40 S. W. (2d) 628, l. c. 630.

In Donohue v. St. Louis, I. M. & S. Ry. Co., 91 Mo. 357, l. c. 364, 2 S. W. 424, the court quoted with approval from Kennayde v. Pacific R. Co., 45 Mo. 255, as follows: "The citizen who on a public highway, approaches a railway track, and can neither see nor hear any indication of a moving train, is not chargeable with negligence for assuming that there is no car sufficiently near to make the crossing dangerous. . . . He has a right to assume that in handling their cars, the railroad company will act with appropriate care; that the usual signals of approach will be seasonably given, and that the managers of the train will be attentive and vigilant." We think that reasonable minds might differ on the question of plaintiff's negligence when his evidence, including the contradictory statements, is considered in the most favorable light, and that such question was one for the jury. Savage v. Chicago, R. I. & P. Ry. Co. et al., supra; Jackson v. Southwest Mo. R. Co. (Mo. Sup.), 189 S. W. 381; Gorman v. Franklin et al. (Mo. Sup.), 117 S. W. (2d) 289; Montgomery v. Mo. Pac. Ry. Co., 181 Mo. 477, 79 S. W. 930; Donohue v. St. Louis, I. M. & S. Ry. Co., supra.

■ Was plaintiff's evidence nullified by contradictory statements to the claim agent and to plaintiff's father? We, in effect, ruled this question in ruling the assignment on contributory negligence. An unsigned question and answer statement made by plaintiff, about 10 days after his injury, to defendant's claim agent and "taken by a court reporter", was introduced by defendant. In this statement is the following: "Q. You ran into the side of a boxcar? A. I don't think I went into the side. I must have hit between two cars, or otherwise I believe it would have knocked me clear. Q. You don't know what happened? A. It felt like that to me." Also,

an unsigned question and answer statement was made to the claim agent by plaintiff's father. In the father's statement is the following: "He (plaintiff) said that he turned to go across and run into this train. . . . Q. He said he walked into the side of this train, did he? A. Yes; he said that night he tried to knock the train off the track, but he didn't have no luck." The father when on the stand was not asked if his son told him that he walked into the side of the train, but the statement went in without objection, and although hearsay, it is worth what it is worth. Tralle v. Chevrolet Motor Co., 230 Mo. App. 535, 92 S. W. (2d) 966, l. c. 971, and cases there cited.

 Concerning the statement plaintiff made to the claim agent, plaintiff's wife testified that in a day or two after plaintiff returned from the hospital a couple of men, "claim agents from the railroad", came to their home; that she made an effort "to keep them from bothering" plaintiff; ". . . told them that he hadn't had any rest and I told them that they could come back later and they insisted talking to him for a few minutes." She said plaintiff "was taking pain tablets dope at that time. . . . Q. Did he seem to be in any condition to talk about business to anybody at that time? A. No, sir, he wasn't." Plaintiff testified that he did not remember talking to the claim agent. "I don't remember the claim agent being there; if my wife hadn't told me that he had been there. I had just been home two days from the hospital and I was full of them tablets." As supporting the contention that plaintiff's evidence as to how he was injured was nullified by his prior statements, defendant cites Ducoulombier v. Thompson, 343 Mo. 991, 124 S. W. (2d) 1105; Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079; Grange v. Chicago & E. I. Ry. Co., 334 Mo. 1040, 69 S. W. (2d) 955; Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644; Goslin v. Kurn et al., 351 Mo. 395, 173 S. W. (2d) 79; Steele v. K. C. Southern Ry. Co., 265 Mo. 97, 175 S. W. 177.

The composite rulings of these cases, so far as pertinent here, are: (1) That an appellate court has the right in any case to determine as a matter of law whether there is substantial evidence to sustain an issue of fact; (2) that submission is not supported by evidence contrary to physical facts or inherently unbelievable or demonstrated to be false; and (3) that the probative value of the evidence of a witness may be destroyed [28] by contradictory and conflicting evidence of the witness absent any reasonable explanation or circumstance tending to show which version is true. It will be noted that the conflict here is not a conflict of *evidence* of plaintiff, but a conflict between his *evidence* and prior extra judicial statements.

As appears, supra, defendant, among other cases, relies upon Steele v. K. C. Southern Ry. Co., 265 Mo. 97, 175 S. W. 177. In that case the plaintiff "had sworn himself out of court" on the first

day of his trial. He had testified that without stopping, looking or listening, he stepped from a place of safety onto the railroad tracks and was immediately struck. On the next day, without any explanation, he "diametrically changed and altered his testimony so that a prima facie case was made out for the jury, where before there was none." It was held that the plaintiff, absent any reasonable explanation, was bound by his first version of the facts. In Davidson v. St. Louis-San Francisco Ry. Co. (banc), 301 Mo. 79, 256 S. W. 169, the court, speaking of the Steele case, said: "The contradictory statements in Steele's case occurred in the same trial and hearing. Such statements stood as admission in a case then being heard. It amounted to contradictory admissions at the single trial. In this, it is to be distinguished from the present case. The general rule is that where a plaintiff at one hearing testifies in a given way, and at a later hearing testifies to the opposite, it is for the jury to determine what credence it will give to the evidence given before them, as impeached by what such party said at the previous hearing." See also Goslin v. Kurn et al., supra; Ellis v. United States, 138 Fed. (2d) 612; Zamora v. Woodmen of the World Life Ins. Soc. (Mo. App.), 157 S. W. (2d) 601; Moses v. Kansas City Public Service Co. (Mo. App.), 188 S. W. (2d) 538.

We might say that there was what appears to be a reasonable explanation as to plaintiff's statement to the claim agent in plaintiff's physical condition at the time as testified to by his wife, and his own evidence as to his condition. The claim agent identified the statement, but was not asked about plaintiff's physical condition. And there are circumstances tending to corroborate plaintiff's evidence that he was struck by the train instead of walking into it or between two cars. These circumstances are that plaintiff was struck on the *right* leg and hip, and then carried about 200 feet. Being struck on the right side is consistent with his evidence that he was walking north over the crossing and was struck by the engine approaching from the east. And it is not likely that plaintiff would have been carried along had he walked into the train or walked between two cars. He might have been so carried if he tried to get on the train, and defendant made inquiry about that, but plaintiff denied that he attempted to board the train.

The contradictory statements went only to credibility and were for the jury.

Plaintiff's instruction No. 1 was his main instruction. Among the hypotheses submitted was: "If you find that said road (over the tracks) was at said time and long prior thereto generally and heavily used by the public and by vehicles and pedestrians, if so, and with the knowledge and acquiesence of defendant, if so, and if you find that said road and crossing was then and there a public road and public crossing . . .." Defendant says that the evidence showed

"the crossing to be a private crossing"; that "there was no evidence that the crossing was generally used or much used at 3 or 4 o'clock in the morning"; that the instruction placed a greater burden on defendant than the law requires and "was misleading to the jury."

Plaintiff says that the evidence shows that the crossing was a public crossing and that defendant's answer so admits. The answer refers to the crossing as the "crossing leading to the Government supply station", and denies that "defendant negligently failed and omitted to blow the whistle and sound the bell or give any warning of the approach of said train to said public crossing." Plaintiff was asked, "Does a public road run into that yard (Government material yard) and across the Missouri Pacific tracks?" and answered, "Yes, people are coming and going over that road day and night. Q. That road is generally used by the public? A. [29] Yes, sir." W. A. Davidson, defendant's assistant civil engineer who made "a plat and blueprint of the crossing" testified that the crossing was "planked for heavy vehicles." George Shull, engineer on the westbound train, testified that he knew there was a road that "turned off the east and west road going to the Government project"; that "traffic of all kinds went along that road continuously"; that he kept "a lookout and did whistle and ring the bell" for the crossing. We do not think that defendant's complaint on instruction No. 1 is well taken.

■ On alleged misconduct of counsel. On cross-examination of defendant's witness Mahin, fireman on the westbound train, plaintiff's counsel made this inquiry: "I want to ask you if after you went out in the hall from the courtroom this claim agent, Mr. Calvert, said to you and to some other men out there, 'I want you boys to remember and get that train on the crossing in your testimony, and you said ok.'" The witness said that he did not say ok. Then he was asked what he did say and answered that he did not remember exactly. He was asked if the claim agent said anything about that (train to be on the crossing) and answered, "He was talking about that. . . . Q. Do you deny the conversation I mention occurred? A. I do not deny that he was talking about the crossing; I deny that I said ok." Counsel for defendant objected that "this whole examination is highly prejudicial", and was sustained. Counsel for plaintiff pursued the subject and counsel for defendant reminded that the court had sustained his objection. Counsel for plaintiff said that he was laying the foundation "for impeachment testimony", and asked: "Did the claim agent say to you, 'Now I want you boys to remember and get that train on the crossing in your testimony?'" The witness answered, "I didn't hear him say that, no sir." Counsel for defendant then said: "We object to the action of Mr. Popham in repeating this error before the jury after the witness had answered him and had said that he didn't hear him and he asks that question

again without any facts before this jury on which to base it and it is prejudicial and the jury should be discharged." Thereupon counsel for plaintiff said: "I submit that the witness had refused to make an answer and I was entitled to an answer for the purpose of laying a foundation and I asked the question again in order that the record might be clear." The court said: "Go ahead, gentlemen."

In rebuttal plaintiff's wife was recalled and testified that she heard the conversation inquired about and then this: "Q. I want you to tell the jury whether or not in that conversation that you heard between Mr. Calvert and the man Mahin, whether or not the claim agent said, 'I want you boys to remember and get that train on the crossing in your testimony', and if the man in the brown suit, Mr. Mahin, said ok? A. Yes, sir." Counsel for defendant made objection and asked that the jury be discharged. The objection was sustained, but there was no ruling on the request to discharge the jury. Defendant does not call our attention to any authority supporting the contention that all this constituted reversible error. The court sustained the objection, besides it would appear that plaintiff's counsel proceeded in the proper manner in his endeavor to impeach the witness Mahin. Barraclough v. Union Pac. R. Co., 331 Mo. 157, 52 S. W. (2d) 998; Jones v. Austin et al. (Mo. App.), 154 S. W. (2d) 378. We do not think defendant was harmed by the complained of conduct of plaintiff's counsel.

We now take up the assignments on the verdict, and will first consider the assignment that the verdict of $22,500 was the result of passion and prejudice. Such an assignment is vitally different from that on an excessive verdict. Stokes v. Wabash R. Co. et al., 355 Mo. 602, 197 S. W. (2d) 304, 1. c. 309; Welch v. Thompson, 357 Mo. 703, 210 S. W. (2d) 79. It is claimed that what occurred in the presence of the jury during plaintiff's effort to impeach witness Mahin prejudiced the jury against defendant and that such prejudice "was reflected in an excessive verdict." An excessive verdict does not necessarily reflect passion and prejudice on the part of the jury. Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 116 S. W. (2d) 27, 1. [30] c. 29, and cases there cited. There was nothing in all that occurred that could reasonably be expected to arouse any resentment or prejudice on the part of the jury against defendant.

Is the verdict excessive? At the time (May 23, 1942) of plaintiff's injury he was 27 years old; then earning $110 per month. He was right handed and lost his right arm at the elbow, and sustained some injury to his back, right leg, right side and right hip. The injuries to the leg, side and hip "healed up" in a few weeks, but his back bothers him "a whole lot yet"; his "main complaints" are his right arm and his back. There was no evidence by a physician. Plaintiff was in the hospital about a week and in about three months was again employed by the Government, but this time he was em-

ployed "as guard at the U. S. Engineers yard" at Napoleon, as we infer. His pay as guard is not shown.

In Kibble v. Quincy, O. & K. C. R. Co., 285 Mo. 603, 227 S. W. 42, the plaintiff's right foot and ankle were crushed necessitating amputation. The verdict was $20,000, and a remittitur of $10,000 was required. In that case the court said [227 S. W. l. c. 46]: "According to a long line of cases decided by this court, where, as here, the only permanent injury is the loss of a limb, an award of damages in excess of $10,000 will not be allowed to stand." See also Bryant v. Kansas City Rys. Co., 286 Mo. 342, 228 S. W. 472, l. c. 476; Rose v. St. Louis-San Francisco Ry. Co., 315 Mo. 1181, 289 S. W. 913, l. c. 920; Johnson v. Chicago & E. I. Ry. Co., 334 Mo. 22, 64 S. W. (2d) 674, l. c. 680. In Petty v. Kansas City Public Service Co., 354 Mo. 823, 191 S. W. (2d) 653, the plaintiff was a girl three years and four months old; her left leg was crushed; required amputation three inches below the knee, and other injuries. A verdict of $18,000, considering the "decline in the purchasing power of the dollar" was not out of line. In Gordon v. Muehling Packing Co., 328 Mo. 123, 40 S. W. (2d) 693, the plaintiff was a laborer 41 years old; earnings $150 per month; injury was the loss of the right hand at the wrist. He had three or four unsuccessful operations in an endeavor to save part of the hand. A verdict for $25,000 was reduced to $17,000. In the brief counsel for plaintiff, in the present case, in the defense of the verdict, stress the purchasing power of money. That of course is important in dealing with an assignment on an alleged excessive verdict, and we do not overlook such. However, we think the rule of uniformity would be more nearly observed if the present verdict be reduced to $15,000.

If plaintiff will, within 10 days from the date of filing this opinion, file here a remittitur of $7,500, the judgment will be affirmed, as of the date of rendition, for $15,000. Otherwise the judgment will be reversed and the cause remanded. It is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.